## **EXHIBITS**

Exhibit 1:   Declaration of Michael O'Connell

Exhibit 2:   Excerpt from District Court Docket, *U.S.A. v. Roof*, 2:15-472-RMG

Exhibit 3:   Dkt. No. 1073, Order

Exhibit 4:   Dkt. No. 1074, Order

Exhibit 5:   Dkt. No. 1052, Judge Norton Statement

Exhibit 6:   Transcript excerpt from 11/17/2016

Exhibit 7:   Transcript excerpt from 01/02/2017

Exhibit 8:   Transcript excerpt from 12/02/2016

Exhibit 9:   Transcript excerpt from 11/22/2016

Exhibit 10:  Declaration of Meredith Childs

Exhibit 11:  Declaration of David I. Bruck

Exhibit 12:  Dkt. No. 1049, Motion to Recuse

Exhibit 13:  Dkt. No. 1051, Judge Wooten Statement

Exhibit 14:  ECF Notification of Dkt. No. 1051

Exhibit 15:  ECF Notification of Dkt. No. 1052

Exhibit 16:  Dkt. No. 1053, Order denying Motion to Recuse

Exhibit 17:  ECF Notification of Dkt. No. 1053

Exhibit 18:  Motion for reconsideration and recusal on new grounds

Exhibit 19:  Dkt. No. 1062, Order denying Motion for reconsideration and recusal

# Exhibit 1
## Declaration of Michael O'Connell

<u>DECLARATION OF MICHAEL P. O'CONNELL</u>

I, Michael O'Connell, state as follows:

1. My name is Michael O'Connell.

2. During the summer of 2015 I received a call from David Bruck. He called because he was recruiting counsel to represent Dylann Roof. He had an idea of another lawyer that would be my cocounsel. I declined to work on the case at that time.

3. A week or two later, David Bruck called me back. He had agreed to be lead counsel in the federal case of Dylann Roof. He asked me to be his co-counsel. I immediately agreed. I have great respect for David Bruck. We were law school classmates and we worked together as Assistant Public Defenders in Columbia, South Carolina at the beginning of our careers.

4. By this time, I had not been keeping up with advances in capital work. I left the Charleston Federal Public Defender's office in 1996. After that I practiced with my wife, doing family law and criminal law.

5. I realized that I was not up to working on the Roof case. I did work on the case around CJA billing and more administrative tasks. But I was not really functioning as co-counsel to David Bruck. I wasn't pulling my weight. I withdrew from the case in the Spring of 2016.

6. Judge David Norton was also a law school classmate. I spoke by phone with him in the summer of 2015 after I told David Bruck I would be his co-counsel for Dylann Roof. I think Judge Norton called me to find out if I had agreed to be one of Dylann Roof's lawyers. I asked Judge Norton what Judge was getting the Roof case. Judge Norton told me, "Gergel really wants to do it, so I'm gonna let him have it."

7. I think I told my wife about this conversation. I don't recall sharing it with anyone else until this month.

8. I told this to Mr. Roof's post-conviction counsel Angela Elleman by telephone on March 12, 2025.

This declaration is based on my first-hand experiences and observations. I am over 18 years of age and am competent to make this declaration.

I, Michael O'Connell, declare under penalty of perjury under the laws of the United States that the forgoing is true and correct.

Executed on _MARCH 20_, 2025, in _CHARLESTON, S.C._.

_Michael P. O'Connell_

Michael O'Connell

1

IFCD 004187

# Exhibit 2

Excerpt from District Court Docket, U.S.A. v. Roof, 2:15-472-RMG

2255,CLOSED

**U.S. District Court**
**District of South Carolina (Charleston)**
**CRIMINAL DOCKET FOR CASE #: 2:15-cr-00472-RMG-1**

Case title: USA v. Roof

Related Case: 2:25-cv-03298-RMG

Date Filed: 07/22/2015

Date Terminated: 01/23/2017

Assigned to: Honorable Richard M Gergel

Appeals court case number: 17-3 4th Circuit

**Defendant (1)**

**Dylann Storm Roof**
*TERMINATED: 01/23/2017*

represented by **Angela S Elleman**
111 Monument Circle

---

| | | |
|---|---|---|
| 09/11/2024 | 1035 | (Ex Parte) EX PARTE MOTION SEALED by Dylann Storm Roof. Proposed order is being emailed to chambers with copy to opposing counsel (Attachments: # 1 Affidavit Declaration of Counsel, # 2 Proposed Order Ex Parte Order)(HaLevi, Jill) (Entered: 09/11/2024) |
| 09/16/2024 | 1036 | **EX PARTE ORDER. Signed by Honorable Richard M Gergel on 9/16/24.(cper, ) (Entered: 09/16/2024)** |
| 01/28/2025 | 1039 | Letter as to Dylann Storm Roof in re: Timing of Filing 2255 Petition (Attachments: # 1 Attachment)(HaLevi, Jill) (Entered: 01/28/2025) |
| 01/29/2025 | 1040 | Letter as to Dylann Storm Roof in re: Response to Notice re Timing of Filing 2255 Petition (Attachments: # 1 Exhibit Attachment)(Stoughton, Kathleen) (Entered: 01/29/2025) |
| 02/06/2025 | 1041 | (Ex Parte) EX PARTE MOTION SEALED by Dylann Storm Roof. Proposed order is being emailed to chambers with copy to opposing counsel (Attachments: # 1 Memo in Support, # 2 Proposed Order)(HaLevi, Jill) (Entered: 02/06/2025) |
| 02/25/2025 | 1044 | MOTION for Discovery by Dylann Storm Roof. Proposed order is being emailed to chambers with copy to opposing counsel (Attachments: # 1 Memo in Support, # 2 Proposed Order)(HaLevi, Jill) (Entered: 02/25/2025) |
| 02/25/2025 | 1043 | **TEXT ORDER as to Dylann Storm Roof: Defendant has moved for authorization to conduct discovery in support of an anticipated Section 2255 motion. (Dkt. No. 1044). The Government is directed to file a response to this motion on or before 3/7/25. AND IT IS SO ORDERED. Entered at the direction of Honorable Richard M Gergel on 2/25/25.(cper, ) (Entered: 02/25/2025)** |
| 03/07/2025 | 1046 | NOTICE OF ATTORNEY APPEARANCE Aaron Stewart appearing for USA. (Stewart, Aaron) (Entered: 03/07/2025) |
| 03/07/2025 | 1047 | RESPONSE in Opposition by USA as to Dylann Storm Roof re 1044 MOTION for Discovery (Schoen, Christopher) (Entered: 03/07/2025) |
| 03/14/2025 | 1048 | REPLY TO RESPONSE to Motion by Dylann Storm Roof re 1044 MOTION for Discovery (HaLevi, Jill) (Entered: 03/14/2025) |
| 03/26/2025 | 1049 | MOTION for Recusal by Dylann Storm Roof. Proposed order is being emailed to chambers with copy to opposing counsel (Attachments: # 1 Exhibit, # 2 Proposed Order)(HaLevi, Jill) (Entered: 03/26/2025) |
| 03/31/2025 | 1050 | **ORDER denying 1044 Motion for pre-petition discovery as to Dylann Storm Roof (1). AND IT IS SO ORDERED. Signed by Honorable Richard M Gergel on 3/28/25.(cper, ) (Entered: 03/31/2025)** |
| 04/04/2025 | 1051 | AFFIDAVIT of Judge Terry Wooten re 1049 MOTION for Recusal . (Itap, ) (Entered: 04/04/2025) |
| 04/04/2025 | 1052 | AFFIDAVIT of Judge David Norton re 1049 MOTION for Recusal . (Itap, ) (Entered: 04/04/2025) |
| 04/04/2025 | 1053 | **ORDER denying 1049 Motion for Recusal as to Dylann Storm Roof (1). AND IT IS SO ORDERED. Signed by Honorable Richard M Gergel on 4/4/25.(cper, ) (Entered: 04/04/2025)** |
| 04/08/2025 | 1054 | Second MOTION for Recusal *and Reconsideration of Order Denying Motion for Recusal* by Dylann Storm Roof. Proposed order is being emailed to chambers with copy to opposing counsel (Attachments: # 1 Exhibit ECF notification of Dkt. 1051, # 2 Exhibit ECF notification of Dkt. 1052, # 3 Exhibit ECF notification of Dkt. 1053, # 4 Proposed Order)(HaLevi, Jill) (Entered: 04/08/2025) |
| 04/13/2025 | 1055 | MOTION to Seal by Dylann Storm Roof. Proposed order is being emailed to chambers with copy to opposing counsel (Attachments: # 1 Memo in Support)(HaLevi, Jill) (Entered: 04/13/2025) |
| 04/17/2025 | 1056 | MOTION for Leave to File *Corrected* 2255 by Dylann Storm Roof. Proposed order is being emailed to chambers with copy to opposing counsel (Attachments: # 1 Memo in Support of Motion to File Corrected 2255, # 2 Exhibit 1, # 3 Exhibit 2)(HaLevi, Jill) (Entered: 04/17/2025) |
| 04/17/2025 | 1057 | Supporting Documents to Motion 1063 to Vacate under 28 U.S.C. § 2255 by Dylann Storm Roof. No proposed order. (Attachments: # 1 Exhibit 1- Report of Dr. Amy Fritz, # 2 Exhibit 2- Report of Dr. Robert Ouaou, # 3 Exhibit 3- Report of Dr. Jay Lucker, # 4 Exhibit 4- Report of Dr. Erin Bigler, # 5 Exhibit 5- Declaration of David Bruck, # 6 Exhibit 6- Declaration of Kimberly Stevens, # 7 Exhibit 7- Declaration of Emily Paavola, # 8 Exhibit 8- Declaration of Michael O'Connell, # 9 Exhibit 9- Declaration of Lindsey Vann, # 10 Exhibit 10- Declaration of Ashley Pennington, # 11 Exhibit 11- Declaration of William (Bill) McGuire, # 12 Exhibit 12- Declaration of Teresa Norris, # 13 Exhibit 13- Declaration of Dr. Donna Schwartz Maddox, # 14 Exhibit 14- Declaration of Dr. Rachel Loftin, # 15 Exhibit 15- Declaration of Dr. George Woods, # 16 Exhibit 16- Declaration of Dr. Arlene Andrews, # 17 Exhibit 17- Declaration of Denise de La Rue, # 18 Exhibit 18- Declaration of Jeffrey Martin, # 19 Exhibit 19- Declaration of Laura Carpenter, # 20 Exhibit 20- Declaration of Meredith Childs, # 21 Exhibit 21- Affidavit of Dr. James Austin 04-14-25, # 22 Exhibit 22- Declaration of Danny Atkinson, # 23 Exhibit 23- Declaration of Ali Burch, # 24 Exhibit 24- Declaration of Brian Fanning, # 25 Exhibit 25- Declaration of Bonnylin Henry, # 26 Exhibit 26- Declaration of Karen Able, # 27 Exhibit 27- Declaration of Kathy Brown, # 28 Exhibit 28- Declaration of Catherine Garren, # 29 Exhibit 29- Declaration of Geoffrey McConnell, # 30 Exhibit 30- Declaration of Ralph Waldrop, # 31 Exhibit 31- Declaration of Kay Horton, # 32 Exhibit 32- Declaration of James Grayson Hicks, # 33 Exhibit 33- Declaration of Kimberly Konzy (Schultz), # 34 Exhibit 34- Declaration of Darce Cruea, # 35 Exhibit 35- Declaration of Alison DeLeon, # 36 Exhibit 36- Declaration of William Shockey, # 37 Exhibit 37- Declaration of Sonya Clifford, # 38 Exhibit 38- Declaration of Amy Roof, # 39 Exhibit 39- Declaration of Tim Livingston, # 40 Exhibit 40- Declaration of Kathleen McAteer, # 41 Exhibit 41- Declaration of Ashley Ireland, # 42 Exhibit 42- Declaration of Brock Pack, # 43 Exhibit 43- Declaration of Alice Richardson, # 44 Exhibit 44- Declaration of Brittany Simmons, # 45 Exhibit 45- Declaration of Jack Zurheide, # 46 Exhibit 46- Declaration of Philip Mubarak, # 47 Exhibit 47- Declaration of Jill Hnat, # 48 Exhibit 48- This Exhibit is filed under seal, # 49 Exhibit 49- Cradock Interview 07-25-16, # 50 Exhibit 50- Baxby 302, # 51 Exhibit 51- McPherson 302, # 52 Exhibit 52- 2016 Area C Demographics, # 53 Exhibit 53- Memo of Investigation 09-07-15, # 54 Exhibit 54- Complete Inmate file CDC, # 55 Exhibit 55- Declaration of Bryan Edelman, # 56 Exhibit 56- Holland news article ("Dylann Roof trial"), # 57 Exhibit 57- Lerman law review article ("Living to Clients"), # 58 Exhibit 58- Steinberg 2012 academic article ("Adolescent Brain Development"), # 59 Exhibit 59- USSC Report ("Youthful Offenders"), # 60 Exhibit 60- Rudolph et al. academic article ("At risk of being risky"), # 61 Exhibit 61- Breiner et al. research |

# Exhibit 3
Dkt. No.1073, Order

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| v. | ) | Criminal No. 2:15-472-RMG |
| | ) | |
| Dylann Storm Roof, | ) | |
| | ) | |
| Defendant. | ) | **ORDER** |
| | ) | |
| _____ | ) | |

Defendant filed a motion to vacate under 28 U.S.C. § 2255 on April 17, 2025 and on that same date filed a motion for leave to file a "corrected" petition on or before July 21, 2025. (Dkt. Nos. 1056, 1057). The Government opposes the motion, arguing that Defendant is not entitled to an extension beyond the April 18, 2025 deadline agreed by the Government in an earlier extension of the filing deadline. (Dkt. No. 1070).

By way of background, Defendant's original deadline for filing his § 2255 petition was October 10, 2023, one year following the date on which his judgment of conviction became final. 28 U.S.C. § 2255(f)(1). The Government subsequently agreed to extensions of the deadline to April 24, 2024 and later to April 18, 2025. (Dkt. Nos. 1029-1 and 1034-1). Defense counsel requested still another extension of the filing deadline until July 21, 2025 on December 12, 2024, explaining that defense counsel had expended considerable time in the prior year seeking clemency. (Dkt. No. 1056-3). On January 10, 2025, an Assistant United States Attorney responded, stating that "[a]fter talking with my chain, we are willing to extend the statute of limitations another 90 days, but this will be the last extension I agree to." (Dkt. No. 1056-2). Defense counsel reports that 17 days after agreeing to extend the filing deadline from April 18, 2025 to July 18, 2025, the

Appellate Chief of the United States Attorney's Office advised defense counsel that she had been directed "to rescind our agreement to extend the filing deadline to July." (Dkt. No. 1056-1 at 3). By Order dated April 18, 2025, the Court directed the Government to explain the basis of its change of position regarding the extension of the statute of limitations to July 21, 2025. (Dkt. No. 1059). The Government has provided the Court no explanation for its unilateral recission of its agreement with Defendant.

The Government characterizes that Defendant's effort to enforce its agreement with the Government to extend the statute of limitations until July 21, 2025 as a request for equitable tolling. If this were in fact the issue, the Government is correct that Defendant could not meet the high bar for equitable tolling of statute of limitations under § 2255. *Holland v. Florida*, 560 U.S. 631, 649 (2010); *Rouse v. Lee*, 339 F.3d 238, 246 (4th Cir. 2003).

The Government, however, mischaracterizes the issue before the Court. The real issue is whether the Government, having reached a written agreement with a defendant to extend the statute of limitations for his § 2255 petition, can unilaterally rescind and disavow that agreement. The Court is frequently asked by the Government to enforce a written agreement with a criminal defendant, often associated with a plea agreement. Buyer's remorse is a common basis for a criminal defendant to seek to disavow an agreement with the Government. This Court consistently enforces such agreements, finding that a defendant is bound by the agreement he has reached with the Government.

Should the same principle not be equally applicable to the Government? There is no suggestion that the Assistant United States Attorney who reached the agreement with defense counsel on January 10, 2025 acted outside his authority. Indeed, he stated that he had spoken to "my chain" and "we are willing to extend the statute of limitations another 90 days, but this will

be the last extension I can agree to." (Dkt. No. 1056-2 at 2). There is also no suggestion of fraud, misconduct by the defendant or his counsel in obtaining this agreement, or mutual mistake, common lawful bases for voiding an agreement. To the contrary, the only explanation in the record is that someone unnamed directed the government attorneys working on this case to rescind their previously granted agreement.

The Court recognizes that whether the Defendant was required to file his petition by April 18, 2025 or will be allowed to file a "corrected" petition by July 21, 2025 is of no great consequence to this case. Defendant has already filed an extensive petition of over 300 pages with 167 attachments. But there is a larger issue here, the duty of the Government to honor its agreements, notably here with a criminal defendant sentenced to death. Chief Justice John Roberts in *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1, 24 (2024) referenced the iconic words of Justice Oliver Wendell Holmes:

> Justice Holmes famously wrote that "[m]en must turn square corners when they deal with the Government." But it is also true, particularly when so much is at stake, the Government should turn square corners in dealing with the people.

The Court tried this case to verdict, and throughout the entire lengthy and complex proceedings, the Government honored every agreement the parties reached. Indeed, in this Court's now nearly 15 years on the bench, the Court cannot recall one instance where the Government has attempted to unilaterally rescind an agreement reached in any case, civil or criminal. This is not normal conduct, and the Court will require the Government to live by its agreements, just as it has required criminal defendants to live by their agreements with the Government.

Consequently, the Court finds that by entering into an agreement on January 10, 2025 to extend the statute of limitations in this case to July 21, 2025, the Government waived its right to enforce its earlier agreed upon deadline of April 18, 2025. The Government's effort to unilaterally

rescind this agreement on January 27, 2025 had no legal effect. Defendant may file a "corrected" petition on or before July 21, 2025, and the "corrected" petition will be treated as the first filed petition in this case. Notably, the agreement between the Government and the Defendant provided that no further extensions will be agreed to by the Government, a deadline the Court will enforce absent a showing by Defendant of extraordinary circumstances to support a request for equitable tolling. The Court will next issue a scheduling order setting forth procedures going forward.

**AND IT IS SO ORDERED**.


s/ Richard Mark Gergel
Richard Mark Gergel
United States District Judge


April 28, 2025
Charleston, South Carolina

# Exhibit 4
## Dkt. No. 1074, Order

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| v. | ) | Criminal No. 2:15-472-RMG |
| | ) | |
| Dylann Storm Roof, | ) | |
| | ) | |
| Defendant. | ) | **ORDER** |
| | ) | |
| _____ | ) | |

After Defendant submitted a motion to vacate under 28 U.S.C. § 2255, which included a 379-page memorandum and 167 exhibits, the Court entered a text order directing the parties to confer over a proposed scheduling order for the processing of the § 2255 petition. (Dkt. No. 1061). The text order stated that if the parties could not reach agreement on a proposed scheduling order, each party should submit alternative proposals to the Court. (*Id*.). After conferring, the parties submitted alternative scheduling orders. (Dkt. Nos. 1066, 1069).

The parties differ on whether Defendant may pursue discovery prior to the Government filing a response to the § 2255 petition. Under the Defendant's proposal, he would have 90 days to file a comprehensive discovery motion, 60 days for the Government to file a response to the discovery motion, and the Defendant would have 45 days to file a reply. If Defendant made the necessary showing of good cause under Rule 6 of the Rules Governing Section 2255 Proceedings, Defendant would then engage in discovery for a period authorized by the Court before the Government filed an answer to the § 2255 petition. (Dkt. No. 1069 at 2).

The Government's proposal provides that it would be allowed to file a response to Defendant's § 2255 petition and Defendant would be allowed to file a reply before the Court

1

USCA4 Appeal: 25-2    Doc: 2-2    Filed: 05/05/2025    Pg: 13 of 95

addressed Defendant's request for discovery under Rule 6. The Government argues that under Rules 7 and 8 of the § 2255 Rules it is anticipated that in some circumstances the § 2255 petition may be subject to dismissal on the papers without discovery, the expansion of the record, or an evidentiary hearing.

After carefully reviewing the proposals and arguments of the parties and considering the most effective, efficient and orderly procedure for addressing the numerous legal and factual issues set forth in Defendant's voluminous filing, the Court grants the Government's proposal that it be allowed to file an answer to test initially the legal sufficiency of Defendant's petition before the Court addresses Defendant's discovery requests. Defendant will be allowed to file a reply to the Government's response to the petition. The Court, with this information, will be in the best position to evaluate the legal sufficiency of Defendant's petition and, if not dismissed, whether good cause exists under Rule 6 to conduct the discovery requested by Defendant.

Therefore, the Court sets the following schedule for the parties to respond to the pending motion to vacate:

1. The Government is directed to file a response to Defendant's § 2255 petition 90 days after Defendant files his "corrected" petition[1];

2. The Defendant may file a reply to the Government's response 45 days thereafter.

**AND IT IS SO ORDERED**.

s/ Richard Mark Gergel
Richard Mark Gergel
United States District Judge

---

[1] By separate order, the Court enforced an agreement reached between the Defendant and the Government that extended the statute of limitations until July 21, 2025.

April 28, 2025
Charleston, South Carolina

# Exhibit 5
## Dkt. No. 1052, Judge Norton Statement

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

United States of America,           )
                                    )
        v.                          )        Criminal No. 2:15-472-RMG
                                    )
Dylann Storm Roof                   )
                                    )
                Defendant.          )
                                    )
_____     )

I submit this statement in response to a motion filed in the above captioned case which

inaccurately contends that I played a role in the assignment of *United States v. Roof* to United

States District Judge Richard Gergel.

1. The Defendant' motion contends that I "let [Judge Gergel] have" the case because he

allegedly indicated an interest in wanting to preside over the case. (Dkt. No. 1049 at 1). This is

simply untrue. I never had *United States v. Roof* assigned to me. I played no role in the

assignment of the case to Judge Gergel. I am unaware of any effort by Judge Gergel to have the

case assigned to him.

2. The docket in *United States v. Roof* sets forth the official record of the case. The docket

documents that the Defendant was indicted on July 22, 2015, and Judge Gergel was assigned the

case the next day, July 23, 2023. (Dkt. Nos. 2, 10). The case went from "unassigned" to Judge

Gergel. No other judge, including myself was assigned the case. Until the case was indicted,

there was no case to be assigned.

3. The Defendant's motion is based upon an erroneous premise that individual district

judges participate in the assignment of criminal cases to them within the District of South Carolina. This is simply not the case. The assignment of criminal cases is made under the direction and supervision of the Chief Judge. Judge Terry Wooten was the chief judge at the time of the indictment of the Defendant Roof.

4. I was not involved in any way in the assignment of the *Roof* case to Judge Gergel. I did not communicate with Chief Judge Wooten or Judge Gergel prior to the assignment of the case and am aware of no facts indicating that this assignment was not handled routinely by Chief Judge Wooten.

5. This is the first occasion in the nearly ten years since the *Roof* case was assigned to Judge Gergel that I have been aware of any claim that I played any role in steering the *Roof* case assignment to Judge Gergel. This did not happen. Anyone who reached the conclusion that I played a role in the assignment of the *Roof* case to Judge Gergel based on a conversation with me misunderstood our discussion.

David C. Norton
United States District Judge

April 3 2025

# Exhibit 6
Transcript excerpt from 11/17/2016

```
 1                IN THE DISTRICT COURT OF THE UNITED STATES
                      DISTRICT OF SOUTH CAROLINA
 2                         CHARLESTON DIVISION

 3

 4      UNITED STATES OF AMERICA,    )        2:15-cr-00472-RMG
                                     )
 5             Plaintiff,            )
                                     )
 6      VS                           )
                                     )        Charleston,
 7      DYLANN STORM ROOF,           )        South Carolina
                                     )        November 17, 2016
 8             Defendant.            )

 9


10                         TRANSCRIPT OF HEARING
                 BEFORE THE HONORABLE RICHARD M. GERGEL,
11                    UNITED STATES DISTRICT JUDGE

12      APPEARANCES:

13      For the Plaintiff:      JULIUS NESS RICHARDSON
                                Assistant U.S. Attorney
14                              U.S. Attorneys Office
                                1441 Main Street, Suite 500
15                              Columbia, South Carolina 29201

16                              MARY J. HAHN
                                Assistant U.S. Attorney
17                              U.S. Department of Justice
                                601 D Street NW, Room 5200
18                              Washington, DC 20003

19                              NATHAN STUART WILLIAMS
                                Assistant U.S. Attorney
20                              U.S. Attorneys Office
                                P.O. Box 876
21                              Charleston, South Carolina

22                              RICHARD E. BURNS
                                Assistant U.S. Attorney
23                              U.S. Department of Justice
                                1331 F Street NW, Suite 625
24                              Washington, DC 20530

25
```

1    determination of whether someone is competent to go to trial.

2    And part of that is that I appoint an examiner, a

3    psychiatrist to go in and examine the defendant.  And if a

4    police officer questions a criminal defendant, they start

5    with Miranda warnings, the kind of warnings you hear on TV,

6    you have a right to remain silent and so forth.  That is not

7    given in a competency examiner's evaluation of a defendant.

8    So there presents a problem that if -- when the defendant

9    says things they may not -- they may violate his rights, his

10   right to remain silent, and if I were to allow such evidence

11   in to a trial, potentially we would have to do the trial over

12   again.

13            So I'm very sensitive about trying to get this

14   right.  Believe me, I weigh with greatest of care the closing

15   of any court proceeding.  And no one can look out at this

16   courtroom on the days in which y'all have faithfully attended

17   and not be moved by the desire to include my victims in every

18   proceeding that I possibly can, but knowing that,

19   understanding all of that, I've got to get it right.  I can't

20   deny the defendant's right to a fair trial.  And I hear what

21   you are saying, and this is the way I'm trying to sort it

22   out.

23            Number one, I'm going to write an order over

24   Thanksgiving, that is in the midst Thanksgiving, I'm writing

25   an order, and I intend to make that order public.  And so I

# Exhibit  7
Transcript excerpt from 01/02/2017

2:15-cr-00472-RMG    Date Filed 11/03/17    Entry Number 989    Page 1 of 25
USCA4 Appeal: 25-2    Doc: 2-2    Filed: 05/05/2025    Pg: 22 of 95

1

```
 1                IN THE DISTRICT COURT OF THE UNITED STATES
                        DISTRICT OF SOUTH CAROLINA
 2                        CHARLESTON DIVISION

 3

 4     UNITED STATES OF AMERICA,     )        2:15-cr-00472-RMG
                                     )
 5               Plaintiff,          )
                                     )
 6     VS                            )
                                     )        Charleston,
 7     DYLANN STORM ROOF,            )        South Carolina
                                     )        January 2, 2017
 8               Defendant.          )

 9

10                        TRANSCRIPT OF HEARING
             BEFORE THE HONORABLE RICHARD M. GERGEL,
11                  UNITED STATES DISTRICT JUDGE

12     APPEARANCES:

13     For the Plaintiff:      JULIUS NESS RICHARDSON
                               Assistant U.S. Attorney
14                             U.S. Attorneys Office
                               1441 Main Street, Suite 500
15                             Columbia, South Carolina 29201

16                             MARY J. HAHN
                               Assistant U.S. Attorney
17                             U.S. Department of Justice
                               601 D Street NW, Room 5200
18                             Washington, DC 20003

19                             NATHAN STUART WILLIAMS
                               Assistant U.S. Attorney
20                             U.S. Attorneys Office
                               P.O. Box 876
21                             Charleston, South Carolina

22                             RICHARD E. BURNS
                               Assistant U.S. Attorney
23                             U.S. Department of Justice
                               1331 F Street NW, Suite 625
24                             Washington, DC 20530

25
```

2:15-cr-00472-RMG    Date Filed 11/03/17    Entry Number 989    Page 15 of 25
USCA4 Appeal: 25-2    Doc: 2-2    Filed: 05/05/2025    Pg: 23 of 95

15

1    So I would have to sequester them.

2          MR. BENDER: Well, I think that in voir dire the

3    jurors are asked, even if you heard something about this

4    case, can you decide this case on the basis of the evidence

5    that's presented in court?  So the question is, do we trust

6    the jurors to do that?

7          THE COURT:  If we always had that view, we would let

8    them hear anything, because they would promise us that they

9    wouldn't consider that.  We don't do that, Mr. Bender, we

10   don't do that.  I have a high degree of confidence in this

11   jury, I know they live in this community, you know, I can't

12   walk down the street without hearing people talk about this

13   case.  I mean, they don't know who I am, but they are talking

14   about it.  And it's just -- you know, it's just one of the

15   realities, and this tragedy has profoundly affected this

16   community.

17         MR. BENDER: Certainly.  And that is one of the

18   reasons that every possible portion of the trial should be

19   conducted publically so that those people in the community

20   who didn't lose anyone personally, but who suffered a loss as

21   a community, can have an understanding about what is

22   happening and why.

23         THE COURT:  I completely agree with you.  You know,

24   I find it hardest to keep my victims out of the hearing on a

25   competency, but it's a closed hearing, I do it because they

# Exhibit  8
Transcript excerpt from 12/02/2016

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF SOUTH CAROLINA
2                 CHARLESTON DIVISION

3   UNITED STATES OF AMERICA        :
                                    :
4              vs.                  :
                                    :
5   DYLANN STORM ROOF               :    2:15 - CR - 472

6

7          Jury selection in the above matter held Wednesday,

8   December 2nd, 2016, commencing at 9:13 a.m., before the

9   Hon. Richard M. Gergel, in the United States Courthouse,

10  Courtroom VI, 85 Broad St., Charleston, South Carolina,

11  29401.

12

13  APPEARED ON BEHALF OF THE UNITED STATES:

14    JAY N. RICHARDSON, ESQ., 1441 Main St., Columbia, SC.

15    NATHAN WILLIAMS, ESQ., P.O. Box 978, Charleston, SC.

16    STEPHEN J. CURRAN, ESQ., 601 D Street, NW, Washington, DC.

17
    APPEARED ON BEHALF OF THE DEFENSE:
18
      DAVID I. BRUCK, ESQ., Washington & Lee School of Law,
19    Lexington, VA.

20    KIMBERLY C. STEVENS, ESQ., 1070-1 Tunnel Rd., Asheville, NC.

21    SARAH S. GANNETT, ESQ., 850 W. Adams St., Phoenix, AZ.

22

23          REPORTED BY DEBRA L. POTOCKI, RMR, RDR, CRR
          Official Court Reporter for the U.S. District Court
24                      P.O. Box 835
                  Charleston, SC  29402
25                    843/723-2208

1  subtle than that.  I frankly saw it in the prior writings, and

2  I spent a good bit last evening reading about that issue,

3  because that's how I understood it.  If you have additional

4  things to say, I'm glad to hear it.  I understand this is

5  something where you and your client frankly have a

6  disagreement.  And one of the issues that I struggle with is

7  you can not have a two-headed monster in the representation of

8  a party.  You can not have two people making a decision, you

9  must have one person.  And that is, you know, one of the many

10  reasons I have concerns about anything other than a

11  consultative role.  I will set it forth fully in my order.  I

12  intend to be in my office at 8:00 a.m. tomorrow morning

13  finishing that order and working on it.  And I feel strongly

14  about it.

15      As I said, Mr. Bruck, I share your view that this is not a

16  good decision to self-represent.  It's not a good decision,

17  but Mr. Roof has the right to make that decision.  I respect

18  that right, I will enforce that right.

19      Thank you.  Please, both of you be seated.

20          MR. RICHARDSON:  Your Honor?

21          THE COURT:  Yes.

22          MR. RICHARDSON:  I'm just responding to your earlier

23  question about 436.

24          THE COURT:  Miss Lena said I may have the number

25  wrong?

# Exhibit  9
Transcript excerpt from 11/22/2016

<pre>
 1                    IN THE DISTRICT COURT OF THE UNITED STATES
                         DISTRICT OF SOUTH CAROLINA
 2                           CHARLESTON DIVISION

 3

 4      UNITED STATES OF AMERICA,      )        2:15-cr-00472-RMG
                                       )
 5                 Plaintiff,          )
                                       )
 6      VS                             )
                                       )        Charleston,
 7      DYLANN STORM ROOF,             )        South Carolina
                                       )        November 22, 2016
 8                 Defendant.          )        Volume II

 9

10                      TRANSCRIPT OF COMPETENCY HEARING
                    BEFORE THE HONORABLE RICHARD M. GERGEL,
11                      UNITED STATES DISTRICT JUDGE

12      APPEARANCES:

13      For the Plaintiff:        JULIUS NESS RICHARDSON
                                  Assistant U.S. Attorney
14                                U.S. Attorney's Office
                                  1441 Main Street, Suite 500
15                                Columbia, South Carolina 29201

16                                MARY J. HAHN
                                  Assistant U.S. Attorney
17                                U.S. Department of Justice
                                  601 D Street NW, Room 5200
18                                Washington, DC 20003

19                                NATHAN STUART WILLIAMS
                                  Assistant U.S. Attorney
20                                U.S. Attorney's Office
                                  P.O. Box 876
21                                Charleston, South Carolina

22                                RICHARD E. BURNS
                                  Assistant U.S. Attorney
23                                U.S. Department of Justice
                                  1331 F Street NW, Suite 625
24                                Washington, DC 20530

25
</pre>

1    Q. So that could manifest in communication as well.

2    A. Um-hum.

3    Q. Can you describe that in a little more detail?

4    A. So can you just clarify your question a little bit?

5    Q. Maybe.  The judge is rolling his eyes at me.

6         THE COURT:  You know, I've read the affidavit, and I

7    understand.  I'm just -- I'm trying to be practical.  I'm

8    trying to apply -- and Dr. Carpenter is an evaluator.  She's

9    got a limited amount of information, and maybe you've already

10   given to me, Ms. Gannett, what she has, which is interesting.

11   I find it interesting.  She writes well, she writes cogently

12   and clearly, and I got it, you know.

13        MS. GANNETT:  Very well, Your Honor.  Let me go to

14   one piece that I think is not obvious.

15   BY MS. GANNETT:

16   Q. I think we've already covered shifting gears in schools

17   and work settings, unless you have more that you want to add

18   by way of examples there, Dr. Carpenter?

19   A. I'm not sure what you are looking for.

20   Q. If there are any other examples of difficulty in shifting

21   gears or topics or activities in school or work setting that

22   you would like to add.  You gave some earlier.

23   A. Um-hum.  Yeah.  You know, just any type of -- any type of

24   requirement to move from one topic to the next, or to

25   integrate new information can be really difficult.

# Exhibit 10
## Declaration of Meredith Childs

## DECLARATION OF MEREDITH CHILDS

I, Meredith Childs, state as follows:

1. My name is Meredith Childs. I now live and work as a state court public defender in Richmond, Virginia.

2. At the time of Dylann Roof's trial in 2016, I lived in downtown Charleston, about 6 blocks from the federal courthouse. I was then a third-year law student at Charleston School of Law.

3. I applied for and was offered a position to work with the South Carolina Commission of Indigent Defense Capital Trial Division (SCCID-CTD) as an unpaid intern beginning at the end of my 2L year. Bill McGuire was my supervisor. Bill was one of the attorneys representing Dylann on the state case against him.

4. The Roof case was already pending before I started working as an intern. My role during my time with the SCCID-CTD was to conduct research and write memos and assist the defense team with anything pertinent to the pending cases. I worked hard to stay updated on what was happening in each case.

5. I was originally selected to work at the SCCID-CTD in March 2016 for only one semester, but once I became involved in assisting with the defense of Dylann Roof and other capital cases, I extended my externship to assist through the conclusion of some cases. I continued working with Bill and the defense team until Dylann's state case was concluded, in the spring of 2017. Although the position was unpaid, the SCCID-CTD paid for my travel and lodging when needed. I learned from Bill and received a lot of in-court trial experience.

6. For Dylann's case, Bill wanted me to sit in on some of the joint federal-state court team meetings, but the federal team would not allow me to attend the meetings. It seemed to me that that federal team was very closed off from the state team, as the federal team very much had their own plan for the case. At the time of the federal court trial, the state court Solicitor was still planning to move forward with a state court trial. The worry for Bill was that the state team might not get the voluminous transcripts from the federal court before the state trial started. Because of this, Bill and I were present at the federal trial every single day, taking notes of everything including witness testimony. My assignment was to write down everything that happened during the trial. I did this, filling almost 9 notebooks with contemporaneous notes from the trial, including sentencing. Bill also took notes on the chain of custody, witnesses, and federal team strategy (especially noting what the team did or did not ask questions about).

7. Every day of the federal trial, from jury selection through sentencing, Bill and I were there. We sat in the back of the left side of the courtroom in the last or second-to-last row with a good view of the entire courtroom.

8. The Slager case was also going on at the same time as the Roof trial, so there was a lot going on in downtown Charleston. The Slager case was one in which a white police officer, Michael Slager, was charged with killing an unarmed black man. That case also generated a lot of strong feelings and significant publicity.

9. The entire right side of the courtroom was filled with the victims' family, victims' friends, people that appeared to be from the church, and other supporters. On the left side of the courtroom were overflowing federal team members, two to three rows of reporters, and state team members. There was never an empty seat.

1

    IFCD 004188

10. It seemed like the victims and victims immediate family sat in the first several rows of the right side of the courtroom. The rest of the rows were people there in support of the victims. Some I believe had political ties, some were in ministry and some were extended family and friends. The middle and back of the courtroom was quieter. I don't remember the last several rows reacting to the testimony the way the front right rows did. Usually the reaction from the front row moved like a wave back several rows. I paid more attention to the family than to other observers. Usually it was one person reacting, then others consoling them. Other than one big outburst (that happened in the sentencing phase, described below), there were other moments of crying when people would leave the courtroom. When this happened, the entire row would shift to allow the individual to leave the courtroom, because everyone was seated on benches. This was disruptive when it occurred during the trial.

11. The courthouse was very chaotic, with reporters, the public trying to get in, tons of family members, and lots of church members, political figures, and others. Sometimes I would hold Bill's seat while he met with Dylann or the federal team because there was limited seating in the main courtroom.

12. I did not have direct contact with any of the victims' family members. Throughout the trial, the court personnel and others shuffled the family in and out of the courtroom, so there was no opportunity to interact with the families. It appeared as though there was a lot of pre-planning that went into how the court handled all individuals present for the victims. The families and anyone else involved with them, like church people or political figures, entered the courtroom after everyone on the left side of the courtroom was seated. During the breaks, this group left first, then the folks on the left side followed. Most people on the left side did not leave the courtroom during the breaks because it was crowded, and people did not want to lose their seats. It all seemed very coordinated, like seating at a formal wedding.

13. I remember thinking that the jury was very attentive to the victims' family members throughout the trial. The jury members were looking over at the victims and their family members throughout the trial.

14. It seemed that there were members of the prosecution team who were there assisting with family, mostly between breaks. They had tissues and stuff ready to give out.

15. There seemed to be a lot of people involved in protecting the victims' and victims' family members because it was so chaotic outside of the courthouse and directly outside the courtroom. The family, church members, and family support were kept in other rooms of the courthouse, where they were escorted by the prosecution team and court staff during breaks.

16. I observed many individuals who seemed connected with the victims being approached and questioned by reporters outside of the courtroom, down the stairs, and near the elevator throughout the trial. The media were like vultures; as soon as anyone remotely connected to the trial walked out of the courtroom, they were attacked with many questions from reporters.

17. "Charleston Strong" bracelets were visible throughout the courtroom during the trial. Charleston Strong stuff was displayed all over the Charleston area from the time of the offense until the trial. Flags were at houses and businesses and hanging from the light poles around town and the Emmanuel church. There were also yarn creations hanging on light poles (with hearts, the date, or other things signifying connection to Charleston Strong) around town. When exiting the courthouse, I remember seeing a Charleston Strong banner and Charleston Strong signs hanging in business windows. I lived about 6 blocks away from the courthouse and saw Charleston Strong paraphernalia displayed beginning right after the crime, but the amount of these displays seemed to increase again

2

IFCD 004189

around the time of the trial. I remember thinking it was odd that wearing the Charleston Strong bracelet was permitted in the courtroom in fear that it would inflame the jury. The Charleston Strong bracelets were available everywhere around town.

18. At the time of the trial, people held up Charleston Strong banners outside of the trial, as well as other signs directed at the Roof trial. It seemed like people wanted to be on the news or know what was happening in the trial. The media and the public were consumed with what was going on. There were news vans everywhere around the courthouse. The Michael Slager trial was also going on at that time, across the street in the state courthouse. Nationally, there were people coming in for the trials. There was media but also lots of the general public coming to check things out as well.

19. Downtown the news crews were everywhere—huge vans and antennas everywhere. Every inch of the Four Corners of Law, the main intersection by the courthouse, was covered with media. Twenty, or so, cameras were facing the door as we walked out of the courthouse to try to catch a statement as people came out. And there was media by the church. I lived about six blocks from the federal courthouse, and the news was everywhere along the way between my home and the courthouse.

20. With the amount of media attention displayed in the downtown area, I believe there's no way the jury wouldn't have seen what was going on in the streets as they arrived at the courthouse daily. I had to walk through all the people to grab lunch during the breaks, and passed by vans with camera crews and news anchors, live on tv talking about daily updates of the trial, so people would gather around. I also remember there was hateful stuff displayed on signs on the street about Dylann, but I don't specifically remember what the signs said. I remember it was along the lines of "he deserves what he gets."

21. At first, it felt like the families would have closure with the trial. Then, once the trial began and pictures of the scene and blood and victims were shown to the entire courtroom, it became very emotional. Some victims and their family members were visibly upset and taken aback by the in-court display. It was hard for everyone in the courtroom. Dylann's lack of reaction also triggered some family members. I could see that Dylann was often the focus of the victims and victims' families' attention due to his demeanor and lack of reaction.

22. When emotional testimony or pictures were shown, sometimes a person would need to get up to leave the courtroom. Each person who left the courtroom during the trial caused a disruption because when one person left, other people followed to assist the person, leaving from different courtroom sections. Once, a female got up to leave the courtroom because she was upset, and a man followed to support her. Everyone watched them, including many jurors, as it was clear that people were racing out behind the woman to support her.

23. Judge Gergel was in command throughout the proceedings. He said, "there won't be a show [circus] in my courtroom." When he communicated with the defense or with Dylann when he was self-representing, Judge Gergel spoke to them differently than when speaking with the prosecution. He gave lenience/leeway and professional courtesy to the prosecution and their witnesses, encouraging them to take their time. Judge Gergel seemed cold to the defense. I saw this and I was worried the jurors would see that too and read into it. Judge Gergel seemed annoyed by the defense/Dylann and wanted to move things along. I don't know if Judge Gergel is always like this or if it was special for this case. His tone was more kind to the prosecution and victims both in front of the jury and not. I remember it being like this the whole time, not just regarding defense objections. It appeared to me that there was this disdain for the defendant and defense counsel throughout the trial in Judge Gergel's tone.

3

IFCD 004190

24. Judge Gergel's attitude throughout the trial seemed to be: " This is my courtroom, my way, my rules." He seemed to feel like the defense was trying to muck things up. He appeared to believe that Dylann didn't have any mental health problems. I felt that there was this air from Judge Gergel that he believed Dylann should be put to death, and that victims and their family members have the right to testify as much as they want and be heard in court. Judge Gergel thanked the victims and families. His tone was over-sanctimonious towards the victims. He seemed to favor the prosecution. He expressed anger towards the defense, always.  He didn't have a poker face. It's probably very hard to understand or feel Judge Gergel's tone just from reading a written transcript. I felt that it was not impartial and I was worried the jury could feel that, too, and read into it.

25. David Bruck made objections softly – He's soft-spoken. I remember that sometimes the attorneys approached the bench to object, but most of the time, everything was in the open, so everyone in the courtroom could hear everything. This meant that defense counsel had to be careful and not overly aggressive with their objections, as everyone was cautious of the high emotions in the courtroom. Judge Gergel's vibe throughout the trial was that it was the victims' loved ones' case and they had the right to be heard. The prosecutor matched the energy of the judge, aggressively advocating for the victims and their families in a very showy way. The prosecutors' objections were opposite of David Bruck and seemed very loud and aggressive, because this was the victims' trial.

26. During the trial, Dylann sat in his zone, in his place. At the start of self-representation, Dylann seemed to try his best to engage with the judge, but when there were objections/comments from the judge, Dylann looked more like he knew he was in over his head, and it was a downward spiral in terms of him being able to interact well with the judge. It appeared that Dylann started to shut down and looked for guidance and help from his defense team.

27. The victims' family members were understandably upset and displayed a lot of emotions in the courtroom, crying and reacting to the difficult testimony.  During both phases of the trial, there was whimpering, visible crying and victims' family members using tissues. Family members visibly consoled each other.

28. I remember when standby counsel made a motion regarding the courtroom decorum. Judge Gergel said they were trying to paint something in the courtroom that was not true; he said that it was a very emotional case but he did not see staff cry. The defense team said that the news reported seeing the team crying but Judge Gergel didn't think it was true. And he said that he did not shed a tear himself. He said that he hadn't seen "too much." This was the time when family members were testifying, so it did feel very somber. There was a mix of emotions from victims and victims' family members including vibes of love and hate at the same time. Against that was a feeling of vengeance from some as well.

29. During the trial, due to my exclusion from the federal defense team meetings, I often felt that I was seeing the trial unwind as a juror would. Of course, based on the role I had with the state defense team I was able to understand things differently than the jury did, but considering the magnitude of the photos and testimony, even for me it was a long time without breaks, and it was heavy testimony and evidence presented. I remember thinking that the jury should have had more breaks.

30. The families of the victims seemed like they had so much grief, love and anger. It was a roller-coaster of emotions, and you could feel all of those raw emotions in the courtroom, depending on the witness and how the defense handled each witness. I had dreams (including some nightmares) for weeks about the trial and the rollercoaster of emotions in the courtroom.

4

IFCD 004191

31. I remember when Dylann spoke in the courtroom, there was often a delay or something odd about his presentation. Dylann would pause, looking uncomfortable. He would look to David Bruck for guidance sometimes. He paused before responding to the judge. I don't remember Dylann ever standing to speak with confidence. Dylann seemed scared of the judge. Judge Gergel's vibe from the bench was "you're guilty of this, and we all know it. We just need to get this over with. We aren't going to delay. The families deserve justice."

32. While Dylann self-represented, he floundered. He kept looking to David Bruck, and then the judge would not hear from David, so Dylann sort of folded up into a ball. Dylann looked to David for help, and I felt that David was trying to explain to Dylann what he needed to do during jury selection, but Dylann couldn't manage what was being explained to him.

33. When it was announced that Dylann would be representing himself, I remember that the reactions across the whole courtroom were of shock. The media seated in front of us seemed to freak out and gasp at the announcement. I felt like people thought Dylann was either crazy and didn't know what he was getting himself into, or that he was just so controlling and evil that he wanted to have control over the trial and what was presented to the jury. Either way, people were upset that Gergel allowed him to represent himself when he had competent attorneys ready to represent him in the courtroom. There was chatter about the decision in the hallway. And in the overflow room I heard chatter among the news media saying they couldn't believe the judge would allow this, given that it's a death penalty case.

34. It seemed to me that most people were like, "What is going on? Why is Dylann allowed to represent himself?" Perhaps there was a fear that he would cross-examine the victims' family members and/or set himself up for an appeal of any convictions.

35. When Felicia Sanders testified at the start of the trial, everyone was paying attention to this captivating testimony. As Felicia testified, it got more and more heated. She was clearly going to be hostile. I remember thinking that David wasn't going to get anything out of her. I don't know why he decided to ask her anything. The line of questioning seemed unhelpful to the defense and only inflamed emotions in the courtroom even more.

36. I remember that the judge was on the bench when Dylann's mother had her heart attack. Something was going on in court at the time. My recollection is that counsel was speaking. I believe that the jury was in the room. Then there was audible distress, and some deputies responded. There was a break, and EMS showed up.

37. At the time, I didn't know what was going on. I remember hearing something and seeing family from the victims' side of the courtroom get up to try to assist someone in the front pew on the left side of the courtroom. Bill and I couldn't see Dylann's mother from the back. The media had the best view, because they sat in front of us. I remember a commotion but not what was said. I can't remember if the judge left the bench, but there was a break and everyone was escorted out of the courtroom. I left the courtroom and sat on the pews during the break, while Bill went to meet with the federal team in the small team room outside the courtroom.

38. After the initial commotion, I recall that EMS went into the courtroom. I couldn't see reactions of Dylann or jurors. Bill and I had no idea what was happening. I'd never met Dylann's mother. And I don't think that she ever returned to the trial. I remember two other people were with her (a man and woman), but I was not sure who that was. I thought it was her sister/brother plus spouse.

5

IFCD 004192

39. In one of my notebooks, during Dylann's opening statement of the penalty phase, I wrote about a victim's family member saying "I'm not listening to that crap – This is stupid", and then leaving the courtroom. Two people followed behind him. It was said pretty loud and audible enough for me to hear, so I believe the jury would have heard the comment as well, as they were closer than I was to the disrupting spectator.

40. I remember that moment -- even without referencing my notebooks -- because I thought it was unprofessional. I remember reactions to that moment in the courtroom. Everyone looked shocked and turned in the direction of the person who left. Even the judge stopped. I was in the back left of the courtroom, so I'm not sure if Dylann reacted. The family member was clearly upset with Dylann representing himself and speaking directly to the jury in his opening statement. I remember everything going silent and everyone looking towards the individual had left the courtroom, with two other people following them out of the courtroom. The benches were like church pews, so everyone had to shift and move to allow him to get out. There was a pause in the entire courtroom.

41. When Jennifer Pinckney testified during the penalty phase, Bill wrote on my notepad "Is this too much?" I believe he was referring to the length of her testimony and the depth of her testimony going into very specific stories. I remember learning that Reverend Pinckney was very high-profile politically and in the church. There were lots of people there for Jennifer Pinckney's support, and she went through his entire life. The testimony was long, filled with pictures and a lot of emotions. Bill may have been referring to her emotions and breaks to have to keep gathering herself. Emotions in the courtroom were up and down, back and forth at this point because Dylann had already been found guilty. This was a high-emotion time, starting with the first victim impact testimony.

42. I remember the discussion at sentencing about whether Father Parker would testify, but not the specifics. I remember the judge telling Dylann several times that he would have to ask questions. There was discussion about whether Dylann could call others (like his mom), but I don't remember what they discussed. Judge Gergel reiterated that he wasn't going to allow counsel to help Dylann, and that he wasn't going to waste time.

43. It was painful to watch Dylann's closing argument at sentencing. He was floundering. It was very short.

44. This declaration is based on my first-hand experiences and observations. I am over 18 years of age and am competent to make this declaration.


I, Meredith Childs, declare under penalty of perjury under the laws of the United States that the forgoing is true and correct.

Executed on _March 25_, 2025, in _Richmond, VA_.

_Meredith Childs_

Meredith Childs

6

IFCD 004193

# Exhibit 11
Declaration of David I. Bruck

## DECLARATION OF DAVID I. BRUCK

I, David I. Bruck, state as follows:

1.     I am over 18 years of age and am competent to make this declaration.

2.     I am a Professor of Law, Emeritus, at the Washington and Lee School of Law in Lexington, Virginia. From 2004 until 2020, I directed Washington and Lee's death penalty defense clinic, the Virginia Capital Case Clearinghouse. Before working in Virginia, I practiced criminal law in South Carolina for twenty-eight years. I specialize in the defense of capital cases at the trial, appellate, and post-conviction stages.

3.     When Judge Richard Gergel contacted me about Dylann Roof's case, I initially declined to represent Dylann. I knew Judge Gergel from early in my career. We had both been lawyers practicing in Columbia, South Carolina for many years.

4.     When I received the call from Judge Gergel, I was still finishing my representation of Dzhokhar Tsarnaev in his federal death penalty trial in Massachusetts. Mr. Tsarnaev had the death penalty formally imposed by Judge O'Toole on June 24, 2015, seven days after Dylann Roof shot and killed nine parishioners at Mother Emanuel A.M.E. Church. With the experience of Tsarnaev's trial so fresh, I was hesitant to take another federal capital case so soon. My co-counsel on the Tsarnaev case, Judy Clarke, advised me not to take on Dylann's case. However, I still had many connections and contacts in South Carolina from my years there. I agreed to try to recruit counsel for Dylann. Recruiting counsel turned out to be harder than I expected, so I ultimately agreed to represent Dylann. On July 23, 2015, Judge Gergel appointed me to represent Dylann Roof on his federal death penalty case filed in Charleston, South Carolina.

5.     As lead counsel for Dylann on his federal charges, I led a team of lawyers, mitigation specialists, paralegals, and law students. Dylann also faced charges in state court, so he had state lawyers working on his case as well. We agreed early on that the two teams would share mitigation specialists and experts. The federal and state teams worked in tandem.

6.     The first time I met Dylann at the Charleston Detention Center, I sat still and quiet for the first few moments. I wanted to be a calm presence for him. Dylann said he hated that and felt he was being observed, which gave me early insight into his personality and how our relationship would develop. Dylann is a unique person, and it was difficult to know exactly how to interact with him.

1

Declaration of David I. Bruck

Initials _DIB_

IFCD 004330

7.      As we began to explore Dylann's life, I found numerous connections between my and Dylann's lives, as we had both lived in Columbia. Dylann's pediatrician was the same pediatrician who had treated my own children. Dylann's sister, Amber, had been to my house once to play with my own daughter when they were young. One of Dylann's teachers had been my neighbor. Joe Roof, Dylan's paternal grandfather, was an attorney in Columbia whom I knew.

8.      With Joe, in particular, I felt a real kinship and affinity. He was a well-known local attorney and leader in the Richland County bar. He had a kind and gentle spirit and a progressive reputation. He had even acted once as a guardian *ad litem* for a capital client of mine who had severe disabilities.

9.      The timing of the federal trial vis-à-vis the state trial was a constant issue as we prepared for trial. The state court prosecutor seemed eager to try Dylann. The state court case seemed like it was going to trial extremely fast. Going to trial too quickly in a death penalty case undermines the fairness and reliability of the process. It takes time to cultivate relationships with witnesses and clients. It takes time to understand the complicated lives of our clients and their families. It takes time to adequately prepare for a capital penalty phase.

10.     In the spring of 2016 the state lawyers got the state court to grant a continuance until January 2017. This was great news. Immediately after this, I decided I wanted to invoke Dylann's speedy trial rights and go to trial on the federal case before the state had a chance to try him. I felt that if the federal trial went forward, then the state case would likely end in a plea bargain. Of course, the contrary was also possible, that the federal case would plead if the case was tried in state court first. The state court attorneys worried that they would be forced to trial quickly if we didn't go first, but we did not test that. In that event they would have made a motion for continuance and tried to make a record about why they were not ready. I did not make a record about why the federal team was not ready, since I was the one asking for the quick trial date.

11.     Members of the team raised with me the possibility of seeking a continuance several times over the summer and fall of 2016. I felt that Judge Gergel would grant us a continuance if we asked, at least with some reasonable notice, but I was committed to the notion of going to trial in the federal case first. The result was that we went to trial before we were ready.

2

Declaration of David I. Bruck                                    Initials *D I B*

12.     In the summer of 2016, we had a suppression hearing in Dylann's case. Sarah Gannett, one of the attorneys on my team, was very keen on this issue and spent many hours working on it. The hearing was closed to the public, including the victims' families, out of fear that it would taint the trial. At a pre-closure hearing, some of the victims' families were vehement in expressing their alarm about being excluded from court, with some indicating a fear that something corrupt would occur behind closed doors. From this point forward, it seemed to me that Judge Gergel went out of his way to cater to the victims families, so much so that the defense often felt we were not getting a fair shake. We felt after this point that he was no longer unbiased, but was siding with the prosecution at times without giving adequate consideration to our issues and positions. He referred to the victims as "my victims" and seemed entirely on their side.

13.     When I invoked Dylann's speedy trial rights, I began to refer to this as "mission impossible." I did not think we were ready for trial in November 2016. It was an impossible mission; we were just hoping to do the best we could. At that time, I did not anticipate the disaster that was coming.

14.     As I look back on it, I realize our team was not even assembled until summer of 2016. It was summer of 2016 that Michael O'Connell got off the case. I had asked Michael to be my co-counsel at the very beginning, and he had agreed. I had great respect and affection for Michael and had been a close friend ever since law school. But Michael had moved on from doing mostly criminal defense work to doing more family court work. He did not seem up to the task of being co-counsel on this case. He did more administrative tasks, like managing CJA budget requests and such. At some point Michael and I both came to the conclusion that it would be better for him to step aside, and he did.

15.     When Michael stepped aside, I had recently gotten Sarah Gannett on board to help with motion writing. Kim Stevens joined as co-counsel. Then I asked Emily Paavola to enter an appearance as an attorney as well, instead of the role she had been filling as a mitigation specialist. We only hired Dr. Rachel Loftin, our autism expert, in June 2016. The decision to go to trial in November 2016 was made based on incomplete information and prior to having secured the assistance of critical experts and key members of the defense team.

16.     While Dylann's case was pending in federal court, a police officer named Michael Slager was also awaiting trial for killing Walter Scott in North Charleston, South Carolina.

3

Declaration of David I. Bruck                                     Initials _D I B_

Slager is white, and the victim was an unarmed Black man, so the case had heightened racial tensions and was a high-profile event. The trial of that case in state court took place across the street from the federal courthouse at the exact time proceedings began in Dylann's case.

17.    A mistrial occurred in the Slager trial, and the tension in Charleston heightened. More security and police officers were present in and around the courthouse. People were concerned about civil unrest and riots.

18.    Not only were we not ready for trial, but we did not build in enough time to work with our client and prepare him for trial.

19.    Dr. George Woods, our consulting psychiatrist whom I greatly respect, had told us as early as March 2016 that we were going to have to begin the difficult process of sharing our penalty phase mental health defense with Dylann soon. He advised that this would take time. We did not appreciate the need for that time.

20.    At some point in the summer of 2016 state lawyer Boyd Young told Dylann's father, Benn Roof, that we believed he had autism. Benn told Dylann this. Dylann was angry and very upset. He was insistent that he did not have autism and became more suspicious at that point that the doctors we were sending to see him were not there just to treat his medical condition.

21.    I visited Dylann not long after he heard from his father that the team thought he had autism. I told Dylann during that jail visit that I predicted that we would not say that he had autism, but we just had to explore everything. That seemed to satisfy him at the time. My priority at that point was to keep him on board. We had a plan to reveal our diagnoses to Dylann, but we should have done it much earlier.

22.    We did not seek a change of venue. I had hired Denise de La Rue as a jury consultant. I informed the Court in June 2016 that I believed a fair and impartial jury could be drawn from Area C, the section of the District of South Carolina that encompasses Charleston. I made this decision without conducting or evaluating a community survey to measure the extent and nature of pretrial publicity. Our jury consultant recommended conducting a poll to understand the community sentiment in Area C, but I did not follow that recommendation. I was concerned about challenging jury selection, given the November trial date. Prior to making decision to conduct the trial in Area C, I did not request that the team's jury consultant conduct any analysis regarding potential prejudicial news coverage in Area C. I did not conduct any

4

Declaration of David I. Bruck                                Initials _D/B_

research related to making a motion for a within-district transfer pursuant to Federal Rule of Criminal Procedure Rule 18 or ask the team jury consultant to do so. I did not conduct any research related to making a motion for a Rule 21(a) motion to transfer venue outside the District of South Carolina. I did not consider any possible comparators for a change of venue motion, despite being provided with jury divisions in the federal courts that would be most similar demographically to Area C. In particular, Area D (Florence), was reasonably close, conveniently accessible to witnesses and interested attendees, and could accommodate a trial of this magnitude and public interest. On June 3, 2016, we had a recommendation from our jury consultant to request more time to complete the jury questionnaire to have a better understanding of the pool's exposure to media closer in time to the trial. I did not follow this advice.

23.    I had concerns about pretrial publicity and the potential prejudice because of the high-profile incidents in the months leading up to Dylann's trial involving the publicity surrounding his jailhouse writings (his so called "manifesto") which was leaked to the press in August 2016. I also had concerns about the publicity related to the Slager case. I learned information from a focus group in August that evidence of community bias was apparent— there was a strong sentiment that the Roof and Slager cases were connected and there was bias towards Dylann. Resource counsel and our jury consultant expressed their concerns with continuing the trial in Area C in light of the simultaneous prosecutions of Dylann and Michael Slager.

24.    Before November 2016, we waived Dylann's presence at the majority of in-court proceedings. Each time, Judge Gergel had us have Dylann execute a waiver of his presence. Dylann preferred not to come to court for a variety of reasons: due to his social anxiety, because he did not want to be strip searched upon returning to the jail, and because of his attachment to routine. But in November, there were several court proceedings that were held without Dylann's presence and without us executing a waiver of his presence. At the time, I was relieved not to have Dylann present for these proceedings, as it allowed me to speak more freely with the Court about matters that would upset Dylann. I did not talk to Dylann about waiving his presence. In fact, when Dylann asked me on one occasion what had happened when I spoke to the judge outside of his presence, I declined to share any information with him.

25.    Dylann learned from the government's expert, Dr. Park Dietz, that our trial team was pursuing an autism diagnosis as part of the mitigation presentation. This infuriated an

Declaration of David I. Bruck                                Initials _D I B_

IFCD 004334

already suspicious client, and he sent a letter to the prosecution, which was forwarded to the Court, on November 3, 2016. He expressed distrust of our team and wanted to represent himself.

26.    We had disclosed our belief that Dylann had autism to the Department of Justice in our efforts to convince them not to seek the death penalty and then for deauthorization of the case. The prosecutors were certainly aware that we believed our client had autism. Additionally, Dr. Dietz's very evaluation was prompted by our 12.2 disclosures, which additionally made clear that autism was part of our plan. We should have anticipated that Dr. Dietz would disclose to Dylann our mental health diagnosis.

27.    Our relationship with Dylann was irreparably damaged by Dr. Dietz's disclosures. Dr. Dietz's revelation that we were pursuing a mitigation case that included Dylann's autism diagnosis was devastating. Dylann became convinced that we were liars who had been tricking him all along. We did not have time to work with him to repair the damage to our relationship.

28.    After Dylann sent the letter to the prosecution in November 2016, Federal Death Penalty Resource Counsel Project Director Judy Clarke, with whom we consulted, recommended that, prior to the competency hearing, we withdraw as counsel or at least obtain conflict counsel for Dylann to consult with, represent his interests during the competency proceedings, and assist our team in determining whether our relationship could be repaired in the event he was found competent. She pointed to the breakdown in communication and stated issues of trust. I did not follow Judy's advice. We forged forward.

29.    Our team moved for a competency evaluation of Dylann on November 7, 2016. A hearing was held on November 21-22, 2016, and Judge Gergel ruled Dylann competent on November 25, 2016. Dylann asked to represent himself on November 27, 2016.

30.    The first competency hearing confirmed for Dylann that we had been dishonest with him for months. The doctors did not testify about thyroid disorder, which is what we had led Dylann to believe they were focused on, but rather about his delusions, psychosis, and autism. This is the real reason they had been retained: for the penalty phase.

31.    I know that it may appear that competency was something that we were expecting to come up. But that is truly not the case. While we knew it was a possibility, we were hoping to get through trial, including presenting evidence in the penalty phase. We were relying on Dylann's social anxiety and lack of experience in the courtroom, hoping that would stifle any protests he had to our mental health presentation. This meant that we were truly not prepared for

6

Declaration of David I. Bruck                                    Initials _D I B_

competency proceedings when they came up on the eve of trial. While our team was made up of seasoned capital litigators, none of us had ever worked on a competency proceeding in a federal capital case. This led to errors and the failure to anticipate numerous problems in our chosen strategy.

32.     The experts whom we called at the competency hearing had been retained for penalty phase. They had not finished their reports for the penalty phase. They had not gone in asking questions about competency to stand trial or ability to work with counsel, so they were at a significant disadvantage. The hearing was rushed, and we did not have any expert properly prepared for the competency issues.

33.     Additionally, Dr. Loftin was abroad in Cyprus and unavailable to us at the time of the competency hearing. We had her write an affidavit from Cyprus stating she had diagnosed Dylann with autism, but she felt uncomfortable opining on competency for the first time while she was away and without access to her data or her notes. We were devastated by this.

34.     We used Dr. Donna Maddox, a psychiatrist we hired for penalty phase, to testify at the November competency hearing. Dr. Maddox was likewise unprepared to comment on competency. While she was in New York attending a family funeral, we asked her to come to Charleston to testify in a competency hearing. She was not adequately prepared for this hearing, and it showed in her testimony.

35.     It was only after competency issues were raised that we started revealing to the Court the extent to which we were unprepared. We had been counting on having time during voir dire and the guilt phase to finish preparing for a penalty phase. Now we were dealing with unexpected competency issues and working around the clock. We began sleeping in shifts, so that the work was literally taking place twenty-four hours a day.

36.     The Court deemed Dylann competent to stand trial by order on November 25, 2016. On November 27, the Court received a motion from Dylann to discharge counsel and represent himself. The Court held a *Faretta* hearing the next day, the first day of jury selection, on November 28, 2016. The Court orally granted Dylann's motion for self-representation and prospective jurors immediately entered the room without even a break. The Court specifically found that Dylann had the capacity to self-represent. I did not object to that, which was a mistake.

7

Declaration of David I. Bruck                    Initials **DIB**

37.     During the November (or "first") competency hearing, we had insisted that Dylann was not competent to stand trial.  But I did not present evidence or argue to the court at that point that Dylann was not able to self-represent.  I understand that the Court made its ruling that Dylann was competent to self-represent based on the Court's own observations.  But, due to the trial team's failures, the Court did not have crucial information about Dylann's impairments that impacted his ability to represent himself.  Dylann could answer direct questions posed to him by the Court in sealed court proceedings.  However, this is not the same as the ability to stand, interrupt proceedings, and object.  This is not the same as being able to receive advice from standby counsel in the middle of ongoing proceedings, and to understand and relay to the Court the relevant arguments.  This is not the same as being able to focus in a courtroom full of jurors, media, and spectators.

38.     I failed to explain to the Court the limitations that Dylann had in this respect.  I expressed to the Court that dealing with Dylann was like dealing with an eight-year-old.  But I didn't fully understand why, other than that I believed he had a developmental disorder.  The reports by experts Dr. Jay Lucker, Dr. Robert Ouaou and Dr. Amy Fritz for postconviction counsel do a much better job at explaining Dylann's functional deficits than I understood or was able to explain to the Court.

39.     I knew that talking with Dylann was challenging.  The Speech Language Pathologist, Dr. Fritz, explains that Dylann's pragmatic language skills are that of a young child.  This is consistent with my experience with Dylann.  Despite his large vocabulary and his ability to form complex sentences, conversation with him is not the typical give and take exchange.  He doesn't begin or end conversations in usual ways.  And he takes very long pauses before answering simple questions.  In short, he has communication and processing impairments.  I attributed these to the diagnosis of autism, but failed to explain these limitations to the Court.  In fact, regardless of the correct diagnosis, the skill deficit is what is important.

40.     We filed a pleading with the Court with an Exhibit noting that: "Competence to stand trial does not consist merely of passively observing the proceedings.  Rather, it requires the mental acuity to see, hear and digest the evidence, and the ability to communicate with counsel in helping prepare an effective defense."  (Docket 562-1).  I tried to convey to the Court the ways in which Dylann's delusions, his rigidity, and his anxiety prevented this.  But I failed to explain the neuropsychological impairments that were underlying this.  I failed to understand that his

8

Declaration of David I. Bruck                                    Initials _DIB_

processing ability and auditory processing were preventing him from participating in the courtroom proceedings. I knew that Dylann was flailing, but I was unable to convey that to the Court. Dylann's high verbal IQ allowed him to mask many of these problems, but it was clear when we spoke to him after court that he was unable to convey to us even what had happened in the courtroom. It was abundantly clear that Dylann's brain did not work properly; it just jumps out at you. But we never were able to adequately convey that to the Court.

41.    At some point in our investigation, Dr. Maddox and Dr. George Woods recommended we hire a speech language pathologist (SLP). A third expert, someone that Lisa Greenman knew and respected in the autism community, also recommended hiring an SLP. We did not follow these recommendations.

42.    At the time of the trial, I had not worked with SLPs and was unfamiliar with auditory processing disorders. Evidence about Dylann's auditory processing disorder would have been relevant under *Indiana v. Edwards* and for accommodations requests for Dylann at trial. It is something I missed.

43.    The experts' recommendation that we hire a speech language pathologist just fell through the cracks. We were so focused on what we saw as Dylann's delusions and psychosis that we failed to think about the ways his brain was impaired, or ways his cognition was affected. We knew he had a high IQ, and this blinded me to the ways he was still impaired. It seemed to me that it had to be more than psychosis and delusions that were affecting Dylann, but our failure to follow the experts' recommendations kept us from discovering these impairments.

44.    We had a neuropsychologist on the case, Dr. Paul Moberg. I knew of Dr. Moberg before this case, and he was extremely well respected. However, Dr. Moberg was undergoing cancer treatments during the entire pendency of his work on Dylann's case. He had asked me to keep the fact of his cancer diagnosis private. He would disappear from contact with us and be unreachable for months at a time. I remember desperately trying to get in touch with him to be able to file our mandatory 12.2 disclosures. Dr. Moberg's absences may have been part of why I did not have much of an understanding of Dylann's brain impairments. I should have replaced Dr. Moberg with a new neuropsychologist as soon as we started having difficulties getting in touch with him.

45.    Judge Gergel questioned Dylann in an *ex parte* hearing on November 7, 2016, as competency was being raised. Dylann told Judge Gergel at that hearing that the mitigation he

9

Declaration of David I. Bruck                                    Initials *DIB*

objected to was "the mental health stuff." Specifically, Dylann told Judge Gergel that we were going to say he had autism. He insisted that he did not have autism and clearly did not want that to be presented. This was consistent with our conversations with Dylann for months. We knew he was not going to be pleased with any mental health diagnosis, which is why we had avoided talking to him about any diagnosis. Yet, he certainly knew that we planned to call numerous family members, church members, acquaintances, and such at the penalty phase. He had not voiced any objection to this plan, only to the idea of him having a "diagnosis."

46.     As Judge Gergel continued to question Dylann at the November 7, 2016 hearing, he essentially talked Dylann into the idea that what Dylann wanted was for nothing at all to be presented at a penalty phase. But until that point, that was not what Dylann had ever articulated.

47.     Because we knew that Dylann would possibly have concerns about any mental health diagnosis, up until the Dr. Dietz disclosure, our experts were seeing Dylann under the guise of learning about and treating his thyroid problem. Early on, Dylann had expressed his anxiety that he had a thyroid problem. He was not being medicated for this at the jail. He also expressed concerns that his body was not symmetrical and his face was malformed. We told him that doctors were coming to evaluate him to be able to advocate for the proper medication for him in the jail. We told him that's why we took his blood when we did genetic testing. We told him when he got a brain scan that was to look at his thyroid. The team had many discussions about how to get these experts in to see Dylann. We introduced each additional expert as someone the prior expert had asked to assist them. Up until the Dr. Dietz disclosure, our experts were seeing Dylann under the guise of evaluating his medical conditions. I felt that was the best way to get Dylann to see the experts, as he was concerned about his thyroid. However, I wanted these experts to later be able to discuss Dylann's potential mental health and mitigation issues.

48.     Once Dylann was found competent, he immediately waived counsel. Our relationship with Dylann was so fractured he could no longer trust us. He clearly did not want to represent himself, but he did not trust us. We were in a difficult position.

49.     Judge Gergel asked me at some point about whether I would reconsider my strategy regarding presenting mental health evidence in light of Dylann's opposition to that plan. I refused to consider this. I felt that Dylann was incompetent and therefore I felt that I could not let him control the presentation of evidence. It was proposed in a team discussion that we negotiate with Dylann. I would not hear of it.

10

Declaration of David I. Bruck                                    Initials _DIB_

50.     I witnessed Dylann struggle through voir dire. He was anxious and unable to ask questions. He clearly wanted help from us, and the judge would not allow it.

51.     During jury selection it appeared to me that Dylann's anxiety was acute, as he could not stand being looked at by others.  He often was unable to communicate orally or in writing with us while court was in session.  He struggled to speak to us when court was in session.  He was unable to answer questions I asked him in court.  He asked that we not speak to him while court was ongoing.  He had a hard time looking down at the notes we passed to him while court was going on. When he did speak it was halting, full of pauses, and awkward. At the time I attributed this all to anxiety, but his processing speed problems combined with his auditory processing problems surely contributed to this and demonstrated the problem was even worse than I could understand at the time.

52.     When we met with Dylann after court had ended for the day, Dylann couldn't relay to us what had happened in court that very day.  We were in a weird relationship with Dylann at this time in which he had no trust at all in us, yet he did not want to self-represent.  He wanted our help at the same time that he wanted nothing to do with us.  We were in an impossible position.  And so was Dylann.

53.     Dylann had some awareness that he was floundering during jury selection, so he allowed us to represent him during the guilt phase of trial. Upon the very first witness, I made major errors.  I elicited damaging testimony from Felicia Sanders on cross examination.  It was awful. I was genuinely not trying to force a mistrial.  Honestly, I was trying to get Ms. Sanders to testify to a statement she had previously given under oath:  that the defendant stated when he was in the church that he intended to commit suicide.  Instead, I elicited inflammatory and damaging testimony about my client being "evil" and belonging in "the pit of hell." I initially didn't hear what Ms. Sanders said, so I asked my question again.  She repeated the harmful statements a second time. Judge Gergel interpreted my questions as intended to elicit a mistrial, in part because they so clearly were questions that were likely to produce this deeply damaging testimony based on Ms. Sanders' demeanor on the day in question. In fact, she had already, during her direct testimony, commented with anger about the defendant's demeanor in the courtroom.  It was an incredibly poor choice of me to ask Ms. Sanders any questions.  I regret my decision deeply and I think it did have an impact on the rest of the trial, making the death sentence for Dylann significantly more likely.

11

Declaration of David I. Bruck                                      Initials *DIB*

54.     I will note that I did not yet have hearing aids at the time of Dylann's trial. I now wear hearing aids. I can see that I needed them at the time of Dylann's trial. My impaired hearing is probably why I didn't hear Ms. Sanders the first time she said her damaging statements about Dylann. At other times, other people would complain that I was not whispering quietly enough when talking to our team or Dylann in the Courtroom. The prosecution at one point assumed I was doing that intentionally so that the jury would hear my statements. This was another result of my impaired hearing.

55.     I was horrified when both the prosecution and the Court thereafter appeared to endorse the view that Dylann would in fact, be headed to hell. Obviously, the notion of Hell itself is a religious view of life after death. But religion also provides opportunities for redemption. The Court and the prosecution were making clear a moral declaration that Dylann was beyond redemption. These statements by the prosecution and the court, while made outside the presence of the jury, were made in front of unsequestered witnesses who had not yet taken the stand. This emboldened these witnesses, was widely reported in the press, and changed the mood of the proceedings. I believe that these caused harm to the trial and increased the likelihood that Dylann would get the death penalty.

56.     After the guilty verdicts, Dylann again asserted he wanted to waive counsel. He did this exclusively so that he could prevent the jury from hearing testimony that he had been diagnosed with autism.

57.     We then raised competency again. But this time we also raised *Indiana v. Edwards*, suggesting that he was incompetent to self-represent. (Docket 837). However the judge ruled that we could only present evidence at the second competency hearing that had occurred or been learned since the first competency hearing. By this time, Dr. Moberg had emerged and was prepared to testify, but he had not seen Dylann since prior to the first competency hearing, so he had nothing to add that the Court would hear. Due to Judge Gergel's restrictions, the neuropsychologist, who had found significant processing speed problems and executive functioning problems, was not able to testify as to the deficits he'd found.

58.     In the same vein, Judge Gergel severely limited Dr. Loftin's testimony in the second competency hearing. She had not seen Dylann since the first competency hearing, so she was limited to facts that had emerged since the first hearing. I had not anticipated that Judge Gergel would so significantly limit the testimony at the second hearing. Because she was

12

Declaration of David I. Bruck

Initials _D/B_

IFCD 004341

unavailable to testify at the first competency hearing, the Court was never able to hear and understand her full testimony, particularly with regard to Dylann's ability to represent himself. Instead, she had to base all of her testimony about Dylann's inability to self-represent on what she could say from some videos she had watched of Dylann's visits with his family.

59.     Dr. Ballenger testified at second competency hearing that Dylann planned to put on a defense. Of course, Dylann did not present any evidence or even argue his cause to the jury. He could not. He was incapable of doing so.

60.     After the death penalty verdict was delivered, I met with Dylann. He was shocked by the verdict. He said, "I'm just a kid. I thought they liked me" (referring to the jury). Representing Dylann felt like representing an eight-year-old child. He was the only person in the courtroom who was shocked by the jury's death verdict, though of course our team was devastated.

61.     We had unreasonably relied on our belief that Dylann's social anxiety and non-confrontational nature during our visits would lead him to be compliant during the trial. We had hoped that he would tolerate the presentation of evidence, even if he opposed it. As I told the Court, I thought he did not have "the capacity to be defiant in court or to in some way try to disrupt the proceedings." I failed to understand my client. This failure was borne, at least in part, by my rush to trial and my failure to heed the advice of my co-counsel and our experts.

62.     I am aware that I can be oblivious to team dynamics. I was so focused on what I was doing in the Roof case that I was caught off guard by how much anger and dissension was present among the team. I knew there was conflict, but I mostly avoided getting involved.

Pursuant to 28 U.S.C. §1746, I, David I. Bruck, declare under penalty of perjury under the laws of the United States that the above is true and correct.

_April 6, 2025_
Date and Place
_Lexington, Virginia_

_David I. Bruck_
David I. Bruck

Declaration of David I. Bruck

13

Initials _DIB_

# Exhibit  12
Dkt. No. 1049, Motion to Recuse

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:15-CR-00472-RMG |
| | ) | |
| Plaintiff-Respondent, | ) | |
| | ) | MOTION FOR RECUSAL |
| v. | ) | |
| | ) | |
| DYLANN STORM ROOF | ) | |
| | ) | |
| Defendant-Petitioner. | ) | |
| _____ | ) | |

## **MOTION FOR JUDGE GERGEL TO RECUSE FROM § 2255 PROCEEDINGS**

Petitioner, Dylann Storm Roof, by and through appointed counsel Jill E.M. HaLevi and Angela S. Elleman, respectfully submits this motion for United States District Court Judge Richard Gergel of the United States Court for the District of South Carolina to recuse himself from § 2255 proceedings in this case or, at minimum, for Judge Gergel to authorize additional proceedings to determine whether he must recuse.

Undersigned counsel has recently learned that, in 2015, when the Department of Justice initiated a case against Mr. Roof, Judge Gergel made known among judges that that he wanted to preside over the case.[1] According to Judge David Norton's contemporaneous account to attorney Michael O'Connor, who has only recently shared this information, Judge Gergel indicated that he "really wants to" preside over Mr. Roof's case. Ex. 1 (O'Connell Dec.) ¶ 6. Because of Judge Gergel's strong desire to preside over Mr. Roof's case, Judge Norton "let him have" the case. Ex. 1 (O'Connell Dec.) ¶ 6.

---

[1] Michael O'Connell provided this information to undersigned counsel within the last few weeks and signed a declaration attesting to his conversation with Judge Norton on March 20, 2025. *See* Ex. 1 (O'Connell Dec.).

It should go without saying that a judge expressing that he "really wants to do" a case, and thus being given the case, is not a typical procedure for case assignment. Nor is it a fair or impartial one. Federal courts have procedures in place to ensure unbiased case assignments: "By statute, the chief judge of each district court has the responsibility to enforce the court's rules and orders on case assignments. Each court has a written plan or system for assigning cases. The majority of courts use some variation of a random drawing."[2] Nothing could be further from following written procedures for randomly assigning cases than assigning a judge a high-profile case because he "really wants to do it" and makes this desire known to the other judges. Ex. 1 (O'Connell Dec.) ¶ 6.

Judge Gergel becoming the judge in Mr. Roof's case by letting other judges know he wanted the case raises serious and disturbing questions about Judge Gergel's ability to remain impartial and unbiased. And of course, depending on Judge Gergel's reasons for wanting the case, the improper assignment may be an indication of even deeper problems with the trial. The incident raises serious Due Process concerns.

These Due Process problems must be explored in § 2255 proceedings. Judge Gergel cannot preside over § 2255 proceedings in which his behind-the-scenes actions and his motivations are a key question. Consequently, Judge Gergel must recuse himself from Mr. Roof's § 2255 proceedings.

Mr. Roof—like any party appearing before a United States District Court—had at trial and has now the right to an impartial judge. Nowhere is the judge's impartiality more important than in a criminal case where the government is seeking the death penalty. "The selection of a

---

[2] United States Courts, *FAQs: Filing a Case*, https://www.uscourts.gov/faqs-filing-a-case#:~:text=The%20majority%20of%20courts%20use,related%20cases%2C%20or%20prisoner%20cases.

judge to preside at a criminal trial is a matter of considerable significance to the criminal defendant." *Cruz v. Abbate*, 812 F.2d 571, 573 (9th Cir. 1987); *see also Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). Thus, "[w]hile a defendant has no right to any particular procedure for the selection of the judge . . . he is entitled to have that decision made in a manner free from bias or the desire to influence the outcome of the proceedings." *Cruz*, 812 F.3d at 574.[3] Assigning a case to a particular judge "for an impermissible reason" is unequivocally prohibited. *Cruz*, 812 F.2d at 574. Such improper manipulation of case assignments "raises not only constitutional issues, but also significant questions regarding the fair administration of justice." *United States v. Pearson*, 203 F.3d 1243, 1255 (10th Cir. 2000).

To ensure judicial proceedings free from bias—or even the possibility or appearance of bias—"[a]ny justice, judge, or magistrate judge of the United States *shall* disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a) (emphasis added). "The very purpose of § 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 865 (1988).

In light of Judge Gergel's unexplained desire to preside over Mr. Roof's trial, his impartiality at trial could reasonably be questioned. Certainly, no judge could be impartial in § 2255 proceedings involving the legal issue of his own impartiality at trial. Therefore, Judge

---

[3] Assignment procedures appropriately allow courts to reassign cases to address practical problems, such as judges falling ill or to balance caseloads. *See, e.g.*, *Sinito v. United States*, 750 F.2d 512, 514 n.3 (6th Cir. 1984) (judges may trade cases so cases are heard in the most geographically convenient courthouse); *State v. Simpson*, 551 So.2d 1303, 1305 n.6 (La. 1989) (courts may reassign cases when a judge falls ill or is incapacitated); Federal Judicial Center, *Ten Steps to Better Case Management* 1 (2d ed. 2014) (noting that assignments for multidistrict litigation (MDL)—complex cases that consume enormous resources—are decided on by an MDL panel and require the consent of the assigned judge).

Gergel must recuse himself from the § 2255 proceedings. At the very least, Judge Gergel should refer this matter to another, disinterested judge to determine whether Judge Gergel can preside over Mr. Roof's § 2255 case. If the matter is referred, the disinterested judge should allow further briefing, development of evidence, and an evidentiary hearing on the matter.

Dated: March 25, 2025                    Respectfully submitted,

                                         */s/  Jill E.M. HaLevi*
                                         Jill E.M. HaLevi
                                         Mediation and Legal Services
                                         102 Broad Street, Suite C
                                         Charleston, SC 29401
                                         843-819-0557
                                         E-Mail: jill@charlestonmediator.com

                                         */s/ Angela S. Elleman*
                                         Angela S. Elleman
                                         Chief, § 2255 Unit
                                         Indiana Federal Community Defenders
                                         111 Monument Circle, Suite 3200
                                         Indianapolis, IN 46204
                                         Phone: 317-383-3520
                                         E-Mail: angie_elleman@fd.org

## DECLARATION OF MICHAEL P. O'CONNELL

I, Michael O'Connell, state as follows:

1. My name is Michael O'Connell.

2. During the summer of 2015 I received a call from David Bruck. He called because he was recruiting counsel to represent Dylann Roof. He had an idea of another lawyer that would be my cocounsel. I declined to work on the case at that time.

3. A week or two later, David Bruck called me back. He had agreed to be lead counsel in the federal case of Dylann Roof. He asked me to be his co-counsel. I immediately agreed. I have great respect for David Bruck. We were law school classmates and we worked together as Assistant Public Defenders in Columbia, South Carolina at the beginning of our careers.

4. By this time, I had not been keeping up with advances in capital work. I left the Charleston Federal Public Defender's office in 1996. After that I practiced with my wife, doing family law and criminal law.

5. I realized that I was not up to working on the Roof case. I did work on the case around CJA billing and more administrative tasks. But I was not really functioning as co-counsel to David Bruck. I wasn't pulling my weight. I withdrew from the case in the Spring of 2016.

6. Judge David Norton was also a law school classmate. I spoke by phone with him in the summer of 2015 after I told David Bruck I would be his co-counsel for Dylann Roof. I think Judge Norton called me to find out if I had agreed to be one of Dylann Roof's lawyers. I asked Judge Norton what Judge was getting the Roof case. Judge Norton told me, "Gergel really wants to do it, so I'm gonna let him have it."

7. I think I told my wife about this conversation. I don't recall sharing it with anyone else until this month.

8. I told this to Mr. Roof's post-conviction counsel Angela Elleman by telephone on March 12, 2025.

This declaration is based on my first-hand experiences and observations. I am over 18 years of age and am competent to make this declaration.

I, Michael O'Connell, declare under penalty of perjury under the laws of the United States that the forgoing is true and correct.

Executed on _MARCH 20_, 2025, in _CHARLESTON, S.C._.

_Michael P. O'Connell_
Michael O'Connell

1

IFCD 004187

## UNITED STATES DISTRICT COURT
## DISTICT OF SOUTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>*Plaintiff-Respondent*, )<br>)<br>v. )<br>)<br>DYLANN STORM ROOF, )<br>)<br>*Defendant-Petitioner.* )<br>_____) | Case No. 2:15-CR-00472-RMG |

## <u>PROPOSED ORDER</u>

After consideration of Defendant's Motion for Judge Gergel to Recuse From § 2255 Proceedings, the Motion is Granted.

It is **ORDERED** that the undersigned United States District Court Judge, to whom the above-styled case has been assigned, hereby recuses himself and refers the case to the Clerk of the Court for reassignment pursuant to 28 U.S.C § 455.

Dated:

_____
The Honorable Richard M. Gergel
United States District Judge

# Exhibit 13
## Dkt. No. 1051, Judge Wooten Statement

AFFIDAVIT OF
SENIOR UNITED STATES DISTRICT JUDGE TERRY L. WOOTEN

I, Terry L. Wooten, Senior United States District Court Judge, swear and affirm:

1. Dylann Roof was convicted of capital murder in the District of South Carolina and sentenced to death.

2. Roof now asserts that the presiding judge in his case, Richard M. Gergel, sitting in Charleston, South Carolina, sought to have Roof's case assigned to him.

3. I was the Chief Judge for the District of South Carolina when charges were brought against Dylann Roof.

4. As the Chief Judge at that time, the assignment of criminal cases was at the discretion of and under my supervision. All criminal cases, including the Roof case, were routinely assigned based on: (i) caseloads that each district judge carried; and (ii) related cases. This process was followed in the Roof case. Judge Gergel was assigned the case by me in light of those criteria.

5. At no time did Judge Gergel request of me that Roof's case be assigned to him. He had no role in the assignment of the Roof case. No other judge had any role in the assignment of the Roof case other than me, acting in my role as Chief Judge. Again, the Roof case was assigned to Judge Gergel in the routine process as previously outlined.

6. In the six years I was Chief Judge, no district judge sought to have a particular case assigned to him or her. All district judges are well aware of the routine assignment of criminal cases as outlined to ensure a balance of work among judges. This is the standard operating procedure in the District of South Carolina.

7. Any assertion that Judge Gergel sought assignment of the Dylann Roof case to himself is not accurate nor a credible assertion. No information has been provided to me to support that contention.

I SO SWEAR.

April 1, 2025
Columbia, SC

Terry L. Wooten,
Senior United States District Judge

# Exhibit  14
## ECF Notification of Dkt. No. 1051

| | |
|---|---|
| **From:** | SCDEfilingstat@scd.uscourts.gov |
| **To:** | scd_ecf_nef@scd.uscourts.gov |
| **Subject:** | Activity in Case 2:15-cr-00472-RMG USA v. Roof Affidavit in Opposition to Motion |
| **Date:** | Friday, April 4, 2025 11:25:46 AM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court

## District of South Carolina

## Notice of Electronic Filing

The following transaction was entered on 4/4/2025 at 11:23 AM EDT and filed on 4/4/2025
**Case Name:**         USA v. Roof
**Case Number:**       2:15-cr-00472-RMG
**Filer:**
**Document Number:** 1051

**Docket Text:**
**AFFIDAVIT of Judge Terry Wooten re [1049] MOTION for Recusal . (ltap, )**

**2:15-cr-00472-RMG-1 Notice has been electronically mailed to:**

Jill EM HaLevi    jill@charlestonmediator.com, clerk@charlestonmediator.com

Christopher Braden Schoen     christopher.schoen@usdoj.gov, CaseView.ECF@usdoj.gov, Kelly.Reynolds@usdoj.gov, USA-SC-ECF-Docket-J@usdoj.gov, USA-SC-ECF-FLU@usdoj.gov, USA-SC-ECF-VW-CHAS@usdoj.gov, USASCALS@usa.doj.gov, deborah.l.deyton@usdoj.gov

Everett Eugene McMillian     everett.mcmillian@usdoj.gov, CaseView.ECF@usdoj.gov, USA-SC-ECF-Docket-M@usdoj.gov, USA-SC-ECF-FLU@usdoj.gov, USA-SC-ECF-VW-CHAS@usdoj.gov, dena.strickland@usdoj.gov

Paige M Fitzgerald     paige.fitzgerald@usdoj.gov

Kathleen Michelle Stoughton     kathleen.stoughton@usdoj.gov, CaseView.ECF@usdoj.gov, Tamieka.Russell-Brown@usdoj.gov, USA-SC-ECF-Docket-J@usdoj.gov, USASC.Postconviction@usdoj.gov

Stephen Curran      stephen.curran@usdoj.gov, eric.peffley@usdoj.gov

Mary J Hahn      mary.hahn@usdoj.gov, eric.peffley@usdoj.gov, mary.hahn3@usdoj.gov

Richard E Burns      richard.burns@usdoj.gov

Angela S Elleman      angie_elleman@fd.org, revae_miller@fd.org

Aaron Stewart      aaron.j.stewart@usdoj.gov

**2:15-cr-00472-RMG-1 Notice will not be electronically mailed to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1091130295 [Date=4/4/2025] [FileNumber=12375429-0
] [8b31c45023052514d37e1a3f63eb482a83f2962e2dff2ce5ec9538cbf3613cdba6a
05670c108cdeea1def46f69919c64140d5c0cdd0f9abdb81b2daf882ffdb2]]

# Exhibit 15
ECF Notificiation of Dkt. No. 1052

| | |
|---|---|
| **From:** | SCDEfilingstat@scd.uscourts.gov |
| **To:** | scd_ecf_nef@scd.uscourts.gov |
| **Subject:** | Activity in Case 2:15-cr-00472-RMG USA v. Roof Affidavit in Opposition to Motion |
| **Date:** | Friday, April 4, 2025 11:26:50 AM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### District of South Carolina

## Notice of Electronic Filing

The following transaction was entered on 4/4/2025 at 11:25 AM EDT and filed on 4/4/2025
**Case Name:** USA v. Roof
**Case Number:** 2:15-cr-00472-RMG
**Filer:**
**Document Number:** 1052

**Docket Text:**
**AFFIDAVIT of Judge David Norton re [1049] MOTION for Recusal . (ltap, )**

**2:15-cr-00472-RMG-1 Notice has been electronically mailed to:**

Jill EM HaLevi    jill@charlestonmediator.com, clerk@charlestonmediator.com

Christopher Braden Schoen    christopher.schoen@usdoj.gov, CaseView.ECF@usdoj.gov, Kelly.Reynolds@usdoj.gov, USA-SC-ECF-Docket-J@usdoj.gov, USA-SC-ECF-FLU@usdoj.gov, USA-SC-ECF-VW-CHAS@usdoj.gov, USASCALS@usa.doj.gov, deborah.l.deyton@usdoj.gov

Everett Eugene McMillan    everett.mcmillian@usdoj.gov, CaseView.ECF@usdoj.gov, USA-SC-ECF-Docket-M@usdoj.gov, USA-SC-ECF-FLU@usdoj.gov, USA-SC-ECF-VW-CHAS@usdoj.gov, dena.strickland@usdoj.gov

Paige M Fitzgerald    paige.fitzgerald@usdoj.gov

Kathleen Michelle Stoughton    kathleen.stoughton@usdoj.gov, CaseView.ECF@usdoj.gov, Tamieka.Russell-Brown@usdoj.gov, USA-SC-ECF-Docket-J@usdoj.gov, USASC.Postconviction@usdoj.gov

Stephen Curran    stephen.curran@usdoj.gov, eric.peffley@usdoj.gov

Mary J Hahn    mary.hahn@usdoj.gov, eric.peffley@usdoj.gov, mary.hahn3@usdoj.gov

Richard E Burns    richard.burns@usdoj.gov

Angela S Elleman    angie_elleman@fd.org, revae_miller@fd.org

Aaron Stewart    aaron.j.stewart@usdoj.gov

**2:15-cr-00472-RMG-1 Notice will not be electronically mailed to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1091130295 [Date=4/4/2025] [FileNumber=12375450-0
] [07ce157564850bcf15cecac50029c66d0f232a16c2b0e3500931dba52f74dd34167
f3519ed4362236119e33a9235213187cdb6b0a03365b6246878ce0764da41]]

# Exhibit 16
Dkt. No. 1053, Order denying Motion to Recuse

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| v. | ) | Criminal No. 2:15-472-RMG |
| | ) | |
| Dylann Storm Roof, | ) | |
| | ) | |
| Defendant. | ) | **ORDER** |
| | ) | |
| _____ | ) | |

This matter comes before the Court on a motion to recuse on the basis that the undersigned allegedly "made known among judges that he wanted to preside" over the above captioned case and that a colleague, Judge David Norton, steered the case to the undersigned. (Dkt. No. 1049 at 1). For reasons set forth below, the motion to recuse is denied.

**Factual Background**

Defendant Dylann Storm Roof was indicted by a federal grand jury on July 22, 2015. (Dkt. No. 2). One day later, on July 23, 2015, the undersigned was assigned the case. (Dkt. No. 10). Under standard assignment procedures for criminal cases in the District of South Carolina, then Chief Judge Terry Wooten made the assignment. (Dkt. No. 1051). According to a statement submitted by Judge Wooten, the case of *United States v. Roof* (hereafter "the *Roof* case") was "routinely assigned" by him and that "at no time did Judge Gergel request of me that Roof's case be assigned to him." (*Id.*) Judge Wooten further stated that Judge Gergel had "no role in the assignment of the Roof case" and "[n]o other judge had any role in the assignment of the Roof case." (*Id.*) Additionally, Judge Wooten stated that "[a]ny assertion that Judge Gergel sought

assignment of the Dylann Roof case to himself is not accurate nor a credible assertion. No information has been provided to me to support that contention." (*Id.*)

Judge Norton submitted a statement in response to Defendant's allegation that "[b]ecause of Judge Gergel's strong desire to preside over Mr. Roof's case, Judge Norton 'let him have' the case." (Dkt. No. 1052). Judge Norton stated that this allegation is "simply untrue. I never had *United States v. Roof* assigned to me. I played no role in the assignment of the case to Judge Gergel. I am unaware of any effort by Judge Gergel to have the case assigned to him." (*Id.*) Judge Norton further explained that Defendant's motion to recuse is based on "an erroneous premise that individual district judges participate in the assignment of criminal cases within the District of South Carolina." (*Id.*). In fact, the "assignment of criminal cases is made under the direction and supervision of the Chief Judge," who was at the time Judge Terry Wooten. Judge Norton stated that "I was not involved in any way in the assignment of the *Roof* case to Judge Gergel. I did not communicate with Chief Judge Wooten or Judge Gergel prior to the assignment of the case and am aware of no facts indicating that this assignment was not handled routinely by Judge Wooten." (*Id.*) Additionally, Judge Norton stated that "[a]nyone who reached the conclusion that I played a role in the assignment of the *Roof* case to Judge Gergel based on a conversation with me misunderstood our discussion." (*Id.*).

## Legal Standard

28 U.S.C. § 455 provides that a judge should disqualify himself in any proceeding in which "his impartiality might reasonably be questioned." This is an objective standard based on a reasonable person fully informed of all of the "surrounding facts and circumstances." *Microsoft v. United States*, 530 U.S. 1301, 1302 (Rhenquist, CJ).

## Discussion

Nearly ten years after the undersigned was appointed to preside over this case and after the case was tried to verdict, affirmed on appeal, and denied certiorari before the United States Supreme Court, Defendant moves to disqualify the presiding judge on the basis that he allegedly sought the assignment and had his colleague, Judge David Norton, steer the case to him. The record before the Court establishes that no reasonable person could question the impartiality of the undersigned when fully informed of all surrounding facts and circumstances.

The record demonstrates that on July 22, 2015, the Defendant was indicted by a federal grand jury. (Dkt. No. 2). Within 24 hours, the case was assigned to the undersigned. (Dkt. No. 10). Under established procedures within the District of South Carolina for the assignment of criminal cases, Chief Judge Terry Wooten assigned the case to the undersigned. Judge Wooten stated in his declaration unequivocally that he, and he alone, made the assignment decision. No one—not the undersigned, not Judge Norton, and not any other judge, made a request to Judge Wooten that the undersigned be assigned the case. (Dkt. No. 1051). Judge Wooten stated that he handled the assignment routinely, based on well established District of South Carolina practices. Judge Wooten also noted that in his six years as Chief Judge, "no district judge sought to have a particular case assigned to him or her." (*Id*.).

Judge Norton, who was alleged in Defendant's motion to recuse to have steered the assignment of the *Roof* case to the undersigned, stated that this allegation is "simply untrue . . . . I played no role, in the assignment of the case to Judge Gergel. I am unaware of any effort by Judge Gergel to have the case assigned to him." (Dkt. No. 1052). Judge Norton stated in his declaration that the Defendant's motion is based on an "erroneous premise" that individual district judges can steer a case to a particular judge. He explained that within the District of South Carolina, the Chief

Judge makes the assignment of criminal cases. Judge Norton stated that he did not communicate with Judge Wooten or the undersigned prior to the assignment of the *Roof* case and he was aware of no information which indicated that "the assignment was not routinely handled by Chief Judge Wooten." (*Id.*). Judge Norton further stated that anyone who reached the conclusion that he had steered the case to the undersigned from a discussion with him "misunderstood our discussion." (*Id.*).

In sum, the person who actually made the assignment of the *Roof* case, Judge Wooten, and the person who the Defendant alleged steered the *Roof* case assignment to the undersigned, Judge Norton, both plainly and unambiguously state there is no truth to this allegation. No reasonable person fully aware of all facts and circumstances surrounding this matter could conclude that the undersigned's impartiality could "reasonably be questioned." 28 U.S.C. § 455. The motion to recuse (Dkt. No. 1049) is **DENIED**.

**AND IT IS SO ORDERED**.

s/ Richard Mark Gergel
Richard Mark Gergel
United States District Judge

April 4, 2025
Charleston, South Carolina

# Exhibit  17
ECF Notification of Dkt. No. 1053

| | |
|---|---|
| **From:** | SCDEFilingstat@scd.uscourts.gov |
| **To:** | scd_ecf_nef@scd.uscourts.gov |
| **Subject:** | Activity in Case 2:15-cr-00472-RMG USA v. Roof Order on Motion for Recusal |
| **Date:** | Friday, April 4, 2025 11:49:49 AM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**District of South Carolina**

### Notice of Electronic Filing

The following transaction was entered on 4/4/2025 at 11:47 AM EDT and filed on 4/4/2025
**Case Name:**     USA v. Roof
**Case Number:**     2:15-cr-00472-RMG
**Filer:**
**Document Number:** 1053

### Docket Text:
**ORDER denying [1049] Motion for Recusal as to Dylann Storm Roof (1). AND IT IS SO ORDERED. Signed by Honorable Richard M Gergel on 4/4/25.(cper, )**

**2:15-cr-00472-RMG-1 Notice has been electronically mailed to:**

Jill EM HaLevi     jill@charlestonmediator.com, clerk@charlestonmediator.com

Christopher Braden Schoen     christopher.schoen@usdoj.gov, CaseView.ECF@usdoj.gov, Kelly.Reynolds@usdoj.gov, USA-SC-ECF-Docket-J@usdoj.gov, USA-SC-ECF-FLU@usdoj.gov, USA-SC-ECF-VW-CHAS@usdoj.gov, USASCALS@usa.doj.gov, deborah.l.deyton@usdoj.gov

Everett Eugene McMillian     everett.mcmillian@usdoj.gov, CaseView.ECF@usdoj.gov, USA-SC-ECF-Docket-M@usdoj.gov, USA-SC-ECF-FLU@usdoj.gov, USA-SC-ECF-VW-CHAS@usdoj.gov, dena.strickland@usdoj.gov

Paige M Fitzgerald     paige.fitzgerald@usdoj.gov

Kathleen Michelle Stoughton     kathleen.stoughton@usdoj.gov, CaseView.ECF@usdoj.gov, Tamieka.Russell-Brown@usdoj.gov, USA-SC-ECF-Docket-J@usdoj.gov, USASC.Postconviction@usdoj.gov

Stephen Curran     stephen.curran@usdoj.gov, eric.peffley@usdoj.gov

Mary J Hahn     mary.hahn@usdoj.gov, eric.peffley@usdoj.gov, mary.hahn3@usdoj.gov

Richard E Burns     richard.burns@usdoj.gov

Angela S Elleman     angie_elleman@fd.org, revae_miller@fd.org

Aaron Stewart     aaron.j.stewart@usdoj.gov

**2:15-cr-00472-RMG-1 Notice will not be electronically mailed to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1091130295 [Date=4/4/2025] [FileNumber=12375641-0
] [127ea569525686d01dc6d725edf8fb0449bfffd0a128bd672a130b91924ea883755
980c8c9d948c654639789c74c4ad355a5394febdef1cf5f3cb03a2077496f]]

# Exhibit 18

Motion for reconsideration and recusal on new grounds

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:15-CR-00472-RMG |
| | ) | |
| Plaintiff-Respondent, | ) | |
| | ) | RENEWED MOTION FOR RECUSAL |
| v. | ) | |
| | ) | |
| DYLANN STORM ROOF | ) | |
| | ) | |
| Defendant-Petitioner. | ) | |
| _____ | ) | |


## MOTION FOR RECONSIDERATION AND SECOND MOTION FOR JUDGE GERGEL TO RECUSE FROM § 2255 PROCEEDINGS


Petitioner, Dylann Storm Roof, by and through appointed counsel Jill E.M. HaLevi and Angela S. Elleman, respectfully submits this Motion for Reconsideration of his Motion to Recuse and a Second Motion for Recusal. In the alternative, counsel requests that the Court authorize additional proceedings before a disinterested judge to determine whether recusal is warranted. Following counsel's filing of the initial motion to recuse, and before the government had the opportunity to respond, two statements from judicial colleagues of Judge Gergel were docketed, apparently by Judge Gergel's judicial assistant, directly disputing the facts set forth in the motion to recuse. Dkt. 1051, 1052. Less than one-half hour later, Judge Gergel denied the motion to recuse, quoting extensively from these just-docketed statements. These new facts form the basis for this motion for reconsideration and give further rise to the need for either recusal of Judge Gergel or the designation of an out-of-district judge to conduct an impartial factfinding proceeding.

## FACTUAL STATEMENT

As set forth in the initial motion to recuse, undersigned counsel recently received credible information that suggested alarming irregularities in the assignment of the District Judge in this high-profile capital case. Dkt. 1049. Specifically, counsel learned that in 2015—prior to the assignment of Mr. Roof's case to any District Judge—Judge Gergel made known in the Charleston division of the District of South Carolina that he wanted to preside over this case.[1] Because of Judge Gergel's desire to preside over Mr. Roof's case, Judge Norton "let him have" the case. Dkt. 1049, Ex. 1.

Based on this information, counsel sought to determine how cases are assigned in the District of South Carolina. Upon request, the Clerk for the District of South Carolina has been unable to provide a written case assignment plan for the District.

These facts were presented in a Motion to Recuse filed in this Court on March 26, 2025 that relied on 28 U.S.C. § 455 and relevant case law to argue that Judge Gergel should recuse from this case because there appear to be Due Process violations with this assignment that must be explored in § 2255 proceedings. Dkt. 1049. In the alternative, counsel asked for the assignment of another judge to determine the underlying merits of these factual allegations. Before the government filed its response to the motion to recuse, on April 4, 2025, two statements—from the other two judges said to have been involved in the assignment of this case to Judge Gergel—appeared on the public docket. Dkt. 1051, 1052. The first statement, from then-Chief Judge and now-Senior United States District Judge Terry L. Wooten was dated April

---

[1] Michael O'Connell, Esq., provided this information to undersigned counsel and signed a declaration attesting to his conversation with Judge Norton on March 20, 2025. *See* Dkt. 1049, Ex. 1 (O'Connell Dec.).

1, 2025, and directly controverted the facts alleged in the defendant's Motion to Recuse, stating that Judge Wooten had assigned the case to Judge Gergel without any consideration of who "wanted" the case. Dkt. 1051. Ex. 1 (ECF notification of Dkt. 1051). The second statement, docketed one minute later, was from United Stated District Court Judge David C. Norton, dated April 3, 2025. Dkt. 1052. Ex. 2 (ECF notification of Dkt. 1052). Judge Norton's statement denied any conversation between himself and Judge Gergel concerning the assignment of this case. *Id.* Both of these docket entries appear to have been caused to be filed on the docket by a staff member with the initials "(ltap)". Dkt 1051, 1052. Judge Gergel's judicial assistant is named Lena Tapscott. *See* https://www.scd.uscourts.gov/mdl-2873/contact.asp. Twenty-three minutes later, Judge Gergel denied the Motion to Recuse in a four-page order that cited extensively to the two statements just docketed. Dkt. 1053. Ex. 3 (ECF notification of Dkt. 1053).

## ARGUMENT

### A.  This Court Should Reconsider Its Denial Of The Motion To Recuse, Given The New Facts Surrounding The Factfinding Process To Date

The new factual information that has emerged since the filing of the initial motion to recuse supports reconsideration. *See, e.g.*, *United States v. Dickerson*, 971 F. Supp. 1023, 1024 (E.D. Va. 1997) (using Federal Rule of Civil Procedure 59(e) as guidance for motion to reconsider in criminal case); *United States v. Fuentes-Morales*, No. 14-cr-556, 2017 WL 541052, at *1 (D.S.C. Feb. 10, 2017) (same). Reconsideration is appropriate where the Court "has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *United States v. Smithfield Foods*, 969 F. Supp. 975, 977 (E.D. Va. 1997) (quoting *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D. Va. 1983)); *see also In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.*, 2016 U.S. Dist. LEXIS

68827 (D.S.C.) (citing *PCS Nitrogen, Inc. v. Ross Dev. Corp.*, <u>126 F. Supp. 3d 611</u> (D.S.C. 2015)). Here the Court has made a "decision outside the adversarial issues presented to the Court by the parties" and thus reconsideration is proper. *See PCS Nitrogen, Inc.* at 632.

Specifically, rather than permitting the adversarial process to occur, or requesting the assignment of a neutral District Judge to fact-find, it appears that the District Court took it upon itself to defend what happened here. To put it bluntly, the District Judge whose recusal is at issue appears to have sought and obtained declarations from his judicial colleagues to rebut a declaration submitted by the defense that called into question Judge Gergel's ability to preside over the Section 2255 proceedings. Then the District Judge quickly relied on those statements to deny recusal, prior to even permitting the parties the opportunity to respond to, let alone confront, those statements.

This lack of an adversarial process for fact-finding violates Mr. Roof's Due Process rights under the Fifth Amendment and provides a sufficient basis for reconsideration of the denial of the motion to recuse.

**B. Mr. Roof Now Asserts An Additional Basis For Recusal Under <u>28 U.S.C. § 455</u>, As Judge Gergel's Recent Actions Further Call Into Question His Impartiality**

Recusal motions are always sensitive to file and to decide. Here, rather than acting with the transparency and respect for the adversarial process required in such situations, the assigned District Judge appears to have undertaken an investigation and fact-gathering mission of his own to counter the factual allegations raised in the recusal motion. *McNeil v. Wisconsin*, <u>501 U.S. 171, 181</u>, n.2 (1991) ("What makes a system adversarial rather than inquisitorial is . . . the presence of a judge who does not (as an inquisitor does) conduct the factual and legal investigation himself, but instead decides on the basis of facts and arguments pro and con adduced by the parties.").

28 U.S.C. § 455 (a) states that "Any justice, judge, or magistrate [magistrate judge] of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." The question under § 455(a) is simply "whether another, not knowing whether the judge is actually impartial, might reasonably question his impartiality on the basis of all of the circumstances." *Rice v. McKenzie*, 581 F.2d 1114 (4th Cir. 1978). The Fifth Amendment requires not just actual impartiality but also the appearance of impartiality. *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825 (1986). Indeed, "the Due Process Clause 'may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way, justice must satisfy the appearance of justice." *Id.* (quoting *In re Murchison*, 349 U.S. 133, 136 (1955).

The Eighth Amendment requires particular rigor in capital cases. *See, e.g., Rippo v. Baker*, 580 U.S. 285, 287 (2017) (per curiam) (in capital cases, "the Due Process Clause may sometimes demand recusal even when a judge 'has no actual bias'" (quoting *Aetna*, 475 U.S. at 825)).

Because of the highly irregular investigation and evidence-gathering in this case, Mr. Roof requests that Judge Gergel recuse himself on this basis. In the alternative, Mr. Roof requests that an impartial judge be appointed to conduct an adversarial process by which this dispute regarding recusal may be properly resolved.

### C. Mr. Roof Moves for Recusal Under 28 U.S.C. § 455 (b)(1), As Judge Gergel Has Personal Knowledge Of The Disputed Evidentiary Facts.

Judge Gergel should recuse from this case based on his personal knowledge of the factual dispute at issue. 28 U.S.C. § 455(b)(1) states that a judge "shall also disqualify himself in the following circumstances: (1) [w]here he has a personal bias or prejudice concerning a party, or *personal knowledge of disputed evidentiary facts* concerning the proceeding." (emphasis added).

Such knowledge must stem from "a source outside the judicial proceeding at hand" in order to disqualify a judge. *Liteky v. United States*, 510 U.S. 540, 545 (1994); *McClain v. Warden, Turbeville Corr. Inst.*, 805 Fed. Appx. 221 (4th Cir. 2020).

The assigned District Judge already had such extra-judicial knowledge with respect to the basis of the initial recusal motion—*i.e.,* how the assignment of the case came about (the core disputed fact). This personal knowledge, and thus, partiality, has only increased through his gathering of judicial declarations and *sub rosa* factfinding that led to the denial of the initial motion.

Attorney Michael O'Connell swore in a signed statement that Judge Norton said to him that Judge Gergel "really wants" the case and thus Judge Norton "let him have" it. Dkt. 1049, Ex. 1. Judge Gergel appears to have caused to be filed statements that dispute that Judge Gergel was granted this case based on any specific request for the case. Dkt. 1051, 1052. The assignment plan described by Judge Wooten contains significant ambiguity and possibility for abuse. Judge Wooten's statement indicates that while he was Chief Judge he assigned cases based on caseloads and related cases. Dkt. 1051. Judge Wooten does not describe the use of a wheel or a neutral system that cannot be manipulated either intentionally or with unintentional bias. And, of course, Judge Gergel would have personal knowledge of the factual dispute that exists among the sworn declaration of Michael O'Connell and the statements of Judges Wooten and Norton. Since Judge Gergel has personal knowledge of the facts underlying this dispute, he is required to recuse. See 28 U.S.C. § 455 (b)(1) ("he *shall* disqualify himself.").

## CONCLUSION

For the foregoing reasons, Judge Gergel should recuse himself from Mr. Roof's case. In the alternative, an impartial, disinterested District Court Judge from outside the District of South Carolina[2] should be assigned to allow further briefing, development of evidence, and an evidentiary hearing on the matter.

Dated: April 8, 2025                          Respectfully submitted,

                                              /s/ Jill E.M. HaLevi
                                              Jill E.M. HaLevi
                                              Mediation and Legal Services
                                              102 Broad Street, Suite C
                                              Charleston, SC 29401
                                              843-819-0557
                                              E-Mail: jill@charlestonmediator.com


                                              /s/ Angela S. Elleman
                                              Angela S. Elleman
                                              Chief, § 2255 Unit
                                              Indiana Federal Community Defenders
                                              111 Monument Circle, Suite 3200
                                              Indianapolis, IN 46204
                                              Phone: 317-383-3520
                                              E-Mail: angie_elleman@fd.org

---

[2] Due to the nature of the factual dispute at issue, a judge from outside the district is necessary.

Exhibit 1

| From: | SCDEfilingstat@scd.uscourts.gov |
|---|---|
| To: | scd_ecf_nef@scd.uscourts.gov |
| Subject: | Activity in Case 2:15-cr-00472-RMG USA v. Roof Affidavit in Opposition to Motion |
| Date: | Friday, April 4, 2025 11:25:46 AM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### District of South Carolina

## Notice of Electronic Filing

The following transaction was entered on 4/4/2025 at 11:23 AM EDT and filed on 4/4/2025
**Case Name:**      USA v. Roof
**Case Number:**      2:15-cr-00472-RMG
**Filer:**
**Document Number:** 1051

**Docket Text:**
**AFFIDAVIT of Judge Terry Wooten re [1049] MOTION for Recusal . (ltap, )**

**2:15-cr-00472-RMG-1 Notice has been electronically mailed to:**

Jill EM HaLevi    jill@charlestonmediator.com, clerk@charlestonmediator.com

Christopher Braden Schoen    christopher.schoen@usdoj.gov, CaseView.ECF@usdoj.gov, Kelly.Reynolds@usdoj.gov, USA-SC-ECF-Docket-J@usdoj.gov, USA-SC-ECF-FLU@usdoj.gov, USA-SC-ECF-VW-CHAS@usdoj.gov, USASCALS@usa.doj.gov, deborah.l.deyton@usdoj.gov

Everett Eugene McMillian    everett.mcmillian@usdoj.gov, CaseView.ECF@usdoj.gov, USA-SC-ECF-Docket-M@usdoj.gov, USA-SC-ECF-FLU@usdoj.gov, USA-SC-ECF-VW-CHAS@usdoj.gov, dena.strickland@usdoj.gov

Paige M Fitzgerald    paige.fitzgerald@usdoj.gov

Kathleen Michelle Stoughton    kathleen.stoughton@usdoj.gov, CaseView.ECF@usdoj.gov, Tamieka.Russell-Brown@usdoj.gov, USA-SC-ECF-Docket-J@usdoj.gov, USASC.Postconviction@usdoj.gov

Stephen Curran     stephen.curran@usdoj.gov, eric.peffley@usdoj.gov

Mary J Hahn     mary.hahn@usdoj.gov, eric.peffley@usdoj.gov, mary.hahn3@usdoj.gov

Richard E Burns     richard.burns@usdoj.gov

Angela S Elleman     angie_elleman@fd.org, revae_miller@fd.org

Aaron Stewart     aaron.j.stewart@usdoj.gov

**2:15-cr-00472-RMG-1 Notice will not be electronically mailed to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1091130295 [Date=4/4/2025] [FileNumber=12375429-0
] [8b31c45023052514d37e1a3f63eb482a83f2962e2dff2ce5ec9538cbf3613cdba6a
05670c108cdeea1def46f69919c64140d5c0cdd0f9abdb81b2daf882ffdb2]]

Exhibit 2

| | |
|---|---|
| **From:** | SCDEfilingstat@scd.uscourts.gov |
| **To:** | scd_ecf_nef@scd.uscourts.gov |
| **Subject:** | Activity in Case 2:15-cr-00472-RMG USA v. Roof Affidavit in Opposition to Motion |
| **Date:** | Friday, April 4, 2025 11:26:50 AM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**District of South Carolina**

### Notice of Electronic Filing

The following transaction was entered on 4/4/2025 at 11:25 AM EDT and filed on 4/4/2025
**Case Name:**      USA v. Roof
**Case Number:**      2:15-cr-00472-RMG
**Filer:**
**Document Number:** 1052

**Docket Text:**
**AFFIDAVIT of Judge David Norton re [1049] MOTION for Recusal . (ltap, )**

**2:15-cr-00472-RMG-1 Notice has been electronically mailed to:**

Jill EM HaLevi      jill@charlestonmediator.com, clerk@charlestonmediator.com

Christopher Braden Schoen      christopher.schoen@usdoj.gov, CaseView.ECF@usdoj.gov, Kelly.Reynolds@usdoj.gov, USA-SC-ECF-Docket-J@usdoj.gov, USA-SC-ECF-FLU@usdoj.gov, USA-SC-ECF-VW-CHAS@usdoj.gov, USASCALS@usa.doj.gov, deborah.l.deyton@usdoj.gov

Everett Eugene McMillian      everett.mcmillian@usdoj.gov, CaseView.ECF@usdoj.gov, USA-SC-ECF-Docket-M@usdoj.gov, USA-SC-ECF-FLU@usdoj.gov, USA-SC-ECF-VW-CHAS@usdoj.gov, dena.strickland@usdoj.gov

Paige M Fitzgerald      paige.fitzgerald@usdoj.gov

Kathleen Michelle Stoughton      kathleen.stoughton@usdoj.gov, CaseView.ECF@usdoj.gov, Tamieka.Russell-Brown@usdoj.gov, USA-SC-ECF-Docket-J@usdoj.gov, USASC.Postconviction@usdoj.gov

Stephen Curran      stephen.curran@usdoj.gov, eric.peffley@usdoj.gov

Mary J Hahn      mary.hahn@usdoj.gov, eric.peffley@usdoj.gov, mary.hahn3@usdoj.gov

Richard E Burns      richard.burns@usdoj.gov

Angela S Elleman      angie_elleman@fd.org, revae_miller@fd.org

Aaron Stewart      aaron.j.stewart@usdoj.gov

**2:15-cr-00472-RMG-1 Notice will not be electronically mailed to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1091130295 [Date=4/4/2025] [FileNumber=12375450-0
] [07ce157564850bcf15cecac50029c66d0f232a16c2b0e3500931dba52f74dd34167
f3519ed4362236119e33a9235213187cdb6b0a03365b6246878ce0764da41]]

Exhibit 3

| From: | SCDEfilingstat@scd.uscourts.gov |
|---|---|
| To: | scd_ecf_nef@scd.uscourts.gov |
| Subject: | Activity in Case 2:15-cr-00472-RMG USA v. Roof Order on Motion for Recusal |
| Date: | Friday, April 4, 2025 11:49:49 AM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### District of South Carolina

### Notice of Electronic Filing

The following transaction was entered on 4/4/2025 at 11:47 AM EDT and filed on 4/4/2025

**Case Name:**     USA v. Roof

**Case Number:**     2:15-cr-00472-RMG

**Filer:**

**Document Number:** 1053

**Docket Text:**
ORDER denying [1049] Motion for Recusal as to Dylann Storm Roof (1). AND IT IS SO ORDERED. Signed by Honorable Richard M Gergel on 4/4/25.(cper, )

**2:15-cr-00472-RMG-1 Notice has been electronically mailed to:**

Jill EM HaLevi    jill@charlestonmediator.com, clerk@charlestonmediator.com

Christopher Braden Schoen    christopher.schoen@usdoj.gov, CaseView.ECF@usdoj.gov, Kelly.Reynolds@usdoj.gov, USA-SC-ECF-Docket-J@usdoj.gov, USA-SC-ECF-FLU@usdoj.gov, USA-SC-ECF-VW-CHAS@usdoj.gov, USASCALS@usa.doj.gov, deborah.l.deyton@usdoj.gov

Everett Eugene McMillian    everett.mcmillian@usdoj.gov, CaseView.ECF@usdoj.gov, USA-SC-ECF-Docket-M@usdoj.gov, USA-SC-ECF-FLU@usdoj.gov, USA-SC-ECF-VW-CHAS@usdoj.gov, dena.strickland@usdoj.gov

Paige M Fitzgerald    paige.fitzgerald@usdoj.gov

Kathleen Michelle Stoughton    kathleen.stoughton@usdoj.gov, CaseView.ECF@usdoj.gov, Tamieka.Russell-Brown@usdoj.gov, USA-SC-ECF-Docket-J@usdoj.gov, USASC.Postconviction@usdoj.gov

Stephen Curran        stephen.curran@usdoj.gov, eric.peffley@usdoj.gov

Mary J Hahn        mary.hahn@usdoj.gov, eric.peffley@usdoj.gov, mary.hahn3@usdoj.gov

Richard E Burns        richard.burns@usdoj.gov

Angela S Elleman        angie_elleman@fd.org, revae_miller@fd.org

Aaron Stewart        aaron.j.stewart@usdoj.gov

**2:15-cr-00472-RMG-1 Notice will not be electronically mailed to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1091130295 [Date=4/4/2025] [FileNumber=12375641-0
] [127ea569525686d01dc6d725edf8fb0449bfffd0a128bd672a130b91924ea883755
980c8c9d948c654639789c74c4ad355a5394febdef1cf5f3cb03a2077496f]]

## UNITED STATES DISTRICT COURT
## DISTICT OF SOUTH CAROLINA

UNITED STATES OF AMERICA,   )
                                 )
      *Plaintiff-Respondent*,  )
                                 )      **Case No. 2:15-CR-00472-RMG**
          v.            )
                                 )
DYLANN STORM ROOF,       )
                                 )
      *Defendant-Petitioner.*  )
_____)

### PROPOSED ORDER

After consideration of Defendant's Renewed Motion for Judge Gergel to Recuse From § 2255 Proceedings, the Motion is Granted.

It is **ORDERED** that the undersigned United States District Court Judge, to whom the above-styled case has been assigned, hereby recuses himself and refers the case to the Clerk of the Court for reassignment pursuant to 28 U.S.C § 455.

Dated:

_____
The Honorable Richard M. Gergel
United States District Judge

# Exhibit 19

Dkt. No. 1062,
Order denying Motion for reconsideration and recusal

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| v. | ) | Criminal No. 2:15-472-RMG |
| | ) | |
| Dylann Storm Roof, | ) | |
| | ) | |
| Defendant. | ) | **ORDER** |
| | ) | |
| _____ | ) | |

      This matter comes before the Court on Defendant's motion to reconsider the denial of the motion to recuse or to authorize additional proceedings before a judge from out of state. (Dkt. No. 1054). By way of background, the motion to recuse was based on an allegation that United States District Judge David Norton steered the assignment of this case to the undersigned because Judge Gergel "wanted to preside over the case." (Dkt. No. 1049 at 1). In response to the motion, Judge Norton submitted a declaration stating that he "was not involved in any way in the assignment of the *Roof* case to Judge Gergel" and "did not communicate with Chief Judge Wooten or Judge Gergel prior to the assignment of the case." (Dkt. No. 1052, ¶ 4). Chief Judge Terry Wooten, who made the assignment of the case to the undersigned, submitted a declaration stating that "[a]t no time did Judge Gergel request of me that Roof's case be assigned to him" and "[n]o other judge had any role in the assignment of the Roof case other than me, acting in my role as Chief Judge." (Dkt. No. 1051, ¶ 5). Judge Wooten further stated that "[a]ny assertion that Judge Gergel sought assignment of the Dylann Roof case to himself is not accurate nor a credible assertion." (*Id*., ¶ 7). Confronted with the clear, unqualified declarations from Judge Norton and Judge Wooten that there was no credible basis for the motion to recuse, defense counsel has now accused these district

1

judges of misconduct and moved to have a district judge from out-of-state conduct an evidentiary hearing on this matter.  (Dkt. No. 1054).

"[A] district court retains the power to reconsider and modify its interlocutory judgments . . . at any time prior to final judgment when such is warranted." *Am. Canoe Assoc. v. Murphy Farms, Inc.*, 326 F.3d 505, 514–15 (4th Cir. 2003). "The power to reconsider or modify interlocutory rulings 'is committed to the discretion of the district court,' and that discretion is not cabined by the 'heightened standards for reconsideration' governing final orders." *Saint Annes Dev. Co. v. Trabich*, 443 F. App'x 829, 832 (4th Cir. 2011) (quoting *Am. Canoe*, 326 F.3d at 514–15); *see also Fayetteville Investors v. Commercial Builders*, Inc., 936 F.2d 1462, 1473 (4th Cir. 1991) (interlocutory orders "are left within the plenary power of the Court that rendered them to afford such relief from them as justice requires"). While "[t]he Fourth Circuit has made clear that standards governing reconsideration of final judgments are not determinative of a Rule 54(b) motion, ... courts have appropriately considered those factors in guiding the exercise of their discretion under Rule 54(b)." *TomTom, Inc. v. AOT Sys. GmbH*, 17 F. Supp. 3d 545, 546 & n.2 (E.D. Va. 2014) (citing cases). These courts therefore "generally do not depart from a previous ruling unless (1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice.'" *Id.* (citing *Am. Canoe*, 326 F.3d at 515). Such issues "rarely arise," and motions to reconsider are rarely granted. *Id.* Courts do not entertain motions to reconsider which ask the Court to "rethink what the Court had already thought through—rightly or wrongly." *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D. Va. 1983); *accord U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Virginia, LLC*, 899 F.3d 236, 258 (4th Cir. 2018) ("As we have noted on more than one occasion, a prior decision does

2

not qualify for the third exception by being just maybe or probably wrong; it must strike us as wrong with the force of a five-week-old, unrefrigerated dead fish. It must be dead wrong.").

The Court has fully addressed the motion to recuse in its original order and finds no basis for reconsideration or additional proceedings based on Defendant's original motion or the motion to reconsider.  No new material facts have emerged to support the claims asserted in the original motion, no changes in the law have occurred, the original decision was not clearly erroneous, and the order would not produce manifest injustice.  Consequently, the motion to reconsider and to conduct additional proceedings before an out of state judge is denied.  (Dkt. No. 1054)

**AND IT IS SO ORDERED**.


s/ Richard Mark Gergel
Richard Mark Gergel
United States District Judge


April 18, 2025
Charleston, South Carolina

3